BC

RECEIVED
6/21/2025
CVK
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

FILED
8/28/2025
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

ILLINOIS DAVID WISHNICK,

Plaintiff, v.

UNITED STATES DEPARTMENT OF COMMERCE,

Defendant.

Case No. _____

1:25-cv-06905
Judge Thomas M. Durkin
Magistrate Judge Young B. Kim
RANDOM / CAT. 2

COMPLAINT FOR INJUNCTIVE RELIEF (Freedom of Information Act, 5 U.S.C. § 552)

INTRODUCTION

Plaintiff David Wishnick ("Plaintiff") brings this action against the United States Department of

Commerce ("DOC" or "Defendant") for violations of the Freedom of Information Act ("FOIA"), 5

U.S.C. § 552, seeking immediate disclosure of agency records improperly withheld by Defendant.

JURISDICTION AND VENUE

This Court has jurisdiction over this action pursuant to 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. § 1331.

Venue is appropriate in this district under 5 U.S.C. § 552(a)(4)(B), as Plaintiff resides in Wilmette,

Illinois.

PARTIES

Plaintiff David Wishnick is the founder and CEO of Nutraberry, now a Delaware C-Corporation

(previously organized as an LLC and continuously operating in Washington State), a business

significantly affected by DOC's failure to comply with

FOIA. Defendant DOC is an agency of the United States Government, subject to FOIA pursuant to 5

U.S.C. § 552(f)(1), which defines agency applicability.

FACTUAL BACKGROUND

Food waste represents a staggering national challenge. According to ReFED, over 38% of the U.S. food supply—equivalent to 91 million tons—goes unsold or uneaten each year, costing the economy $473 billion annually and generating nearly 6% of U.S. greenhouse gas emissions. Nearly 13% of Americans are food insecure, underscoring the moral and economic urgency of creating better food recovery systems. Addressing food waste is among the most effective climate solutions available, with far-reaching benefits for environmental sustainability, food access, and economic efficiency. This case is grounded in that national imperative.

Plaintiff holds a B.S. in Chemical Engineering and an MBA from Seattle University—a university that has publicly committed to addressing food waste. Nutraberry's technical innovation leverages advanced Israeli milling technology, selected for its capacity to unlock value from fruit and vegetable fiber, chickpea pea hulls typically byproducts with low value non edible applications without solvent extraction. Nutraberry process is food grade conducted in a single pass of non-extracted fibers continuously, reducing cost of goods sold (COGS) and making five-micron dietary fibers price-competitive in food applications.

The company's scientific rigor and value innovation—creating meaningful commercial value rather than innovation for its own sake—are not only proven through federal validation but have nevertheless been excluded from state-level support for reasons that remain opaque and are subject to this FOIA request.

Plaintiff's pursuit of transparency via FOIA is rooted in firsthand experiences that shaped Nutraberry's ethical mission. Plaintiff worked closely within food supply chains—as a cashier at Whole Foods for over seven years across from the Amazon Head Quarters in Seattle, tutoring refugee students in Seattle public school for five years, and performing sanitation at Franz Bakeries—deepening his understanding of systemic inequities. These experiences reinforced his

resolve to responsibly transform overlooked agricultural byproducts into nutritionally valuable products, a mission validated by USDA funding yet repeatedly sidelined by opaque state-level decisions. This underscores the critical need for transparency through FOIA.

 FruitSmart, a Washington State company that has received preferential treatment—including a free Upcycled Food Association (UFA) certification worth an estimated $7,000.00—is owned by Universal Corporation, a billion-dollar, NYSE-traded conglomerate whose origins trace back to the

beginnings of the tobacco industry, an institution historically enriched through enslaved labor (Exhibit J). In this instance, a system that claims to advance equity instead reinforced legacy structures of exclusion.

Internal communications revealed UFA assigned bonus points for applicants of color, which was then used to justify FruitSmart's selection over Nutraberry, despite FruitSmart's quality limitations and lack of technical innovation (Exhibit J). In addition to certifying FruitSmart for free, the Upcycled Food Association (UFA) received grant funding from ReFED, and has actively advised the Washington State Department of Ecology on food waste initiatives. ReFED itself is cited in Washington State's HB 2301 as a key source for prioritizing recovery strategies, creating a circular dynamic in which funders and advisors have worked in concert while excluding Plaintiff. These overlapping relationships further demonstrate the need for transparency and reinforce the central importance of the FOIA request at issue. Joel Gamoran, a Mercer Island– based chef and media personality, received prominent support under HB 2301 to promote banana peel–based products— despite bananas not being grown in Washington State. Mercer Island is one of the wealthiest zip codes in the U.S., home to tech elites including Bill Gates and Jeff Bezos. According to the Washington Department of Ecology's own blog, Mr. Gamoran's project was funded outside of the competitive grant process, under discretionary authority established by HB 2301. He will also serve

as emcee of ReFED's 2025 Food Waste Solutions Summit—an event where Nutraberry, despite having been excluded from ReFED funding, will be exhibiting. This contrast illustrates how discretionary funding authority and curated visibility have been selectively deployed—while USDA-funded innovation like Plaintiff's has been repeatedly sidelined. These patterns underscore the urgent need for transparency through the FOIA request at issue. These funding decisions also raise structural concerns about proximity and influence. Representative Chipalo Street, who represents Plaintiff's district and sits at the intersection of technology and environmental policy, is also employed by Microsoft—a company with deep ties to Washington's political and philanthropic landscape (https://housedemocrats.wa.gov/street/). ReFED, which received a $15 million "transformational grant" from the Ballmer Group in 2022 to expand its national food waste innovation network, now plays a central role in advising state agencies and curating visibility in the food recovery space. The Ballmer Group, based in Seattle and founded by former Microsoft CEO Steve Ballmer, is a key philanthropic driver behind many regional and national initiatives. Meanwhile, Joel Gamoran—recipient of discretionary HB 2301 funding for banana peel–based products—lives in Mercer Island and will serve as ReFED's 2025 Food Waste Solutions Summit emcee. While speculative, it would not be surprising if this circle of funders, influencers, and policymakers has long shared the same events, panels, and coffee shops. For a USDA-funded company like Nutraberry to be excluded from this ecosystem—despite commercial validation and public benefit—raises serious questions about gatekeeping and favoritism. These dynamics make Plaintiff's FOIA request all the more urgent and necessary.

Meanwhile, companies like FruitSmart, which maintain influence in the regional market, have actively excluded Nutraberry rather than focus on raising the quality of their own product offerings. Plaintiff has compiled over twenty-one exhibits (A through W) demonstrating Nutraberry's public benefit mission, commercial viability, scientific merit, and repeated exclusion from publicly

supported opportunities. These include grant rejection notices, investor contracts, USDA correspondence assigning liability, documentation of successful product deployment, and now USDA research highlighting the untapped nutritional and economic value of peanut skins (Exhibit V), and legislative correspondence acknowledging the inequity Nutraberry has faced in state-level grant programs (Exhibit W). Together, they form a cohesive record of reputational and financial damage—underscoring the practical necessity of FOIA resolution. A complete listof exhibits (A through W) accompanies this complaint and substantiates each claim presented herein. Unlike vertically integrated processors such as FruitSmart—which produce their own seedless purees and juices and—Nutraberry maintains an agnostic supply chain model. This approach fosters collaboration across Washington's raspberry market, which produces 95% of the U.S. supply in open fields, and enables scalable recovery of diverse agricultural waste streams, including peanut skins. As documented by USDA Agricultural Research Service (Exhibit V), peanut skins contain bioactive compounds that show promise for improving gut health and nutritional outcomes. Nutraberry's platform is positioned to deliver on this potential through scalable, continuous, solvent-free fiber processing. Defendant failed to comply with FOIA's statutory 20-business-day timeline for responding to appeals as set forth in 5 U.S.C. § 552(a)(6)(A)(ii).

Plaintiff made multiple good-faith attempts to obtain timely responses from Defendant, including communications with the Office of Government Information Services (OGIS) and the congressional office of Representative Adam Smith. As of the date of filing this complaint, both FOIA appeals remain unanswered, constituting an improper withholding of agency records. These attempts and submissions are detailed in Exhibits A through D. Plaintiff applied to the HudsonAlpha AgTech Accelerator (https://www.gener8tor.com/investment-accelerators/hudsonalpha-agtech). The program, administered and ultimately decided by gener8tor on behalf of HudsonAlpha, declined Plaintiff's application explicitly citing liability concerns related to Plaintiff's USDA-funded research,

specifically due to unresolved cybersecurity issues (Exhibit M). This rejection was

based on USDA's assertion of recipient negligence (Exhibit U). As documented in correspondence

from USDA's NIFA (Exhibit U), the agency communicated that Nutraberry, as the prime recipient,

was considered responsible for the breach and must repay the funds if unable to continue the

project. Plaintiff contends that the FOIA requests are essential to establishing that Nutraberry took

all reasonable steps to protect the USDA funds, including seeking cybersecurity services that were

ultimately denied by Impact Washington.

Plaintiff received explicit support from the Washington State Red Raspberry Commission,

representing over fifty raspberry farmers, as early as November 6, 2023 (**Exhibit X**). Despite this

robust industry backing and clear alignment with grant objectives, Plaintiff was subsequently

informed by a WSDA judge that Nutraberry's application lacked individual letters from farmers—an

unreasonable expectation given that other successful applicants received funding without such

letters. Plaintiff explicitly addressed these discrepancies with Impact Washington during the Circular

Innovation Challenge (eventually becoming Precycle and then created a Nectcycle for two parrell

feeding grant programing), highlighting specifically that another company—The 2050 Company,

originating from the University of Washington—used contract manufacturers, thus underscoring a

significant gap in quality, authenticity, and fairness of application evaluations. Rather than resolving

Plaintiff's legitimate concerns, the situation subsequently worsened, systematically depriving

Plaintiff of essential support. Plaintiff was placed in an untenable position: economically and

professionally marginalized to the point of financial dependency, with his economic independence

effectively imprisoned by arbitrary, biased administrative actions. Plaintiff reasonably asserts that

this pattern of exclusion was severe, deliberate, and tantamount to an existential threat to his

financial survival.

Plaintiff explicitly challenged Impact Washington regarding this arbitrary evaluation process,

particularly highlighting The 2050 Company's reliance on contract manufacturing and minimal operational investment. When Plaintiff expressed concerns that Impact Washington had failed to sufficiently advocate for Nutraberry, their representative responded ambiguously that Plaintiff "didn't know if they fought for Nutraberry" before subsequently claiming they were restricted by a nondisclosure agreement (NDA). Plaintiff asserts that judges or evaluators signing NDAs, particularly public officials affiliated with entities such as King County, introduces serious concerns regarding transparency, accountability, and conflicts of interest in state-administered grant competitions. Such arrangements further compromised Nutraberry's ability to receive fair consideration and transparently unde rstand funding outcomes.

Moreover, the prioritization of projects such as drinking straws over Nutraberry's food recovery solutions directly undermines the U.S. Environmental Protection Agency's (EPA) Food Recovery Hierarchy, which explicitly prioritizes recovery of edible food materials. The intuitive necessity of food as a source of sustenance and nutrition—compared to a straw, a mere utensil transferring food from cup to mouth—highlights the irrationality and fundamentally flawed priorities of the selection process. If stranded on an island, the critical importance of food over a straw is self-evident, yet Nutraberry's tangible food recovery innovations were inexplicably overlooked in favor of trivial, utensil-focused projects.

Specifically, regarding the WSDA Local Infrastructure Grant, Plaintiff faced particularly unjust scrutiny. A competing applicant—a bread cooperative—openly dismissed the necessity of obtaining letters of support, documents reflecting genuine effort, credibility, and industry alignment, yet inexplicably received funding. Meanwhile, Nutraberry, despite diligently securing substantive endorsements from leading industry organizations, was unfairly penalized. In contrast, for the PreCycle Innovation Challenge, no applicants were required or even expected to present letters of support at all, underscoring inconsistent and arbitrary standards across different

Washington State grant programs. This further supports Plaintiff's assertion that the selection processes were not only arbitrary but deliberately discriminatory.

Subsequently, Plaintiff collaborated with Dr. Josh Clevenger from HudsonAlpha Institute for Biotechnology, who provided peanut skins for joint research initiatives. Although gener8tor made the rejection decision, Dr. Clevenger later noted that, had he been informed in time of Plaintiff's technical relevance to the peanut market, he may have successfully intervened with gener8tor to secure Nutraberry's inclusion, given the company's unique value to HudsonAlpha's regional goals. This underscores how gener8tor lacked the technical insight that HudsonAlpha, as its client, possessed. Inclusion in the HudsonAlpha AgTech Accelerator would have provided Plaintiff with a $100,000 investment ($50,000 equity and $50,000 SAFE), individualized mentorship, access to HudsonAlpha's research facilities, and deep exposure to Alabama's agtech industry, venture networks, and regional stakeholders—resources especially valuable given Nutraberry's alignment with peanut processing innovation in the Southeast, particularly important given that Plaintiff had already secured an executed investment agreement from Loyal VC (Exhibit T). This failure in communication compounded the damage caused by the unresolved FOIA issues. The FOIA requests are not academic—they directly impact Nutraberry's ability to clear its name with USDA, prevent clawback of grant funding, reestablish credibility for future federal opportunities, and re-engage with high-value partners and investment programs that have sidelined the company due to these unresolved issues.

Further demonstrating Plaintiff's ongoing credibility and competitive market positioning, Plaintiff recently received an invitation to submit a full project proposal to BEAM Circular for up to $75,000 of direct grant funding (Exhibit Q), reinforcing the economic significance and lost potential due to exclusion from similar opportunities such as HudsonAlpha's accelerator.

Plaintiff's technology is complementary to that employed by Polyphenolics, a subsidiary of E. &

J. Gallo Winery. While Polyphenolics extracts low-molecular-weight polyphenols for use in standardized supplements, Nutraberry upcycles the remaining fiber fraction—a material left behind and typically discarded. This fiber contains heavier molecular weight polyphenols, which are poorly absorbed but known to exhibit prebiotic activity in the human gut, supporting microbiome health. Nutraberry's work therefore expands the value chain by targeting a distinct and underutilized class of polyphenols. Nutraberry has begun follow-up conversations with BEAM Circular, which could further support and scale this complementary recovery pathway (Exhibit H). Despite clear technical and market merit validated independently by a USDA award—selected precisely for its unbiased, merit-based evaluation—Plaintiff experienced systemic exclusion in Washington State, presumably due to local biases related to perceived financial status and insider relationships rather than the scientific or economic value of Plaintiff's work. Plaintiff pursued the USDA grant specifically to avoid local political biases, never anticipating that systemic institutional prejudices and unresolved administrative transparency issues (evidenced by ongoing FOIA requests) would continue to impede Plaintiff's legitimate business pursuits. Washington State's award decisions directly conflict with EPA's Food Recovery Hierarchy (Exhibit R) and HB 2301 (Exhibit P), which prioritize edible food recovery (Exhibit M). In one conversation with the Washington Department of Commerce, officials could not acknowledge that glass will never decompose into methane—despite awarding grants intended to mitigate greenhouse gas emissions to a glass recycling firm. These contradictions further highlight the need for transparency through FOIA. Plaintiff successfully fulfilled an initial order for Salt & Straw, providing five-micron defatted raspberry seed powder funded by USDA research. Salt & Straw subsequently placed an additional order (Exhibit S) to include Plaintiff's product in their upcycled menu, highlighting Plaintiff's market viability and commercial potential. This Salt & Straw purchase order marked the first commercial use of Nutraberry's USDA-funded five-micron powder. Although Salt & Straw intended to include Nutraberry's ingredient in their national Upcycled Food

menu, Plaintiff was only able to supply a fraction of the order. Nutraberry lacked the funds to scale production due to exclusion from multiple Washington State grant programs, including Precycle (Exhibit L), Next Cycle (Exhibit L), Evergreen Manufacturing (Exhibit L), WSDA Local Infrastructure (Exhibits N and O), and Green Jobs grants (Exhibit I; Exhibit K)—programs that instead funded companies producing non-edible materials like glass and t-shirts. Despite ReFED's public mission to support food waste innovation and its Memoranda of Understanding with the USDA, EPA, and FDA, Nutraberry was also excluded from their funding, without feedback or justification. However, due to funding constraints exacerbated by repeated exclusions from Precycle, Next Cycle, WSDA local infrastructure grants, Evergreen Manufacturing grants, and ReFED grants, Plaintiff was unable to fulfill subsequent orders and capitalize fully on this major market opportunity.

In light of these exclusions—despite Plaintiff's market-ready technology, USDA funding, and national credibility—access to the requested FOIA records is necessary to determine whether Nutraberry has been improperly disadvantaged by agency conduct, bias, or the influence of unaccountable public-private networks

CLAIMS FOR RELIEF

COUNT I – Failure to Comply with Statutory Deadlines (Violation of FOIA, 5 U.S.C. § 552(a)(6)(A)(ii))

Plaintiff re-alleges paragraphs 1 through 17.

Defendant DOC violated FOIA by failing to respond to Plaintiff's appeals within the statutory 20- business-day deadline.

COUNT II – Improper Withholding of Records (Violation of FOIA, 5 U.S.C. § 552(a)(3)(A))

Plaintiff re-alleges paragraphs 1 through 19.

Defendant improperly withheld responsive records, thereby violating FOIA's mandate for prompt disclosure.

**REQUESTED RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court:

A. Order Defendant to immediately process Plaintiff's FOIA appeals and release all responsive, non-exempt documents;

B. Grant expedited consideration of this action pursuant to 28 U.S.C. § 1657;

C. Recognize and address the tangible damages and disruptions caused to Plaintiff's business and personal livelihood due to Defendant's failure to comply with FOIA;

D. Award Plaintiff costs incurred in this action;

E. Grant such other and further relief as the Court deems appropriate;

F. Declare that Plaintiff took reasonable steps to safeguard USDA grant funds, and that timely resolution of the FOIA requests is essential to restoring Plaintiff's standing with federal agencies and publicly funded partnerships;

G. Order Defendant to produce a *Vaughn index* and all non-exempt records within 20 days of the Court's judgment;

H. Declare that Defendant improperly denied Plaintiff's fee waiver request in violation of 5 U.S.C. § 552(a)(4)(A)(iii).

Respectfully submitted,

**David Wishnick**

*David Wishnick*

805 Hibbard Rd Wilmette,
Illinois, 60091 (425)
577-9020
david.wishnick@gmail.com

Dated: June 18, 2025

 Outlook

# Exhibit A

---

## Fw: complaint number 23-0564 Fw: Case Closure Notification

---

**From** david nutraberryinc.com <david@nutraberryinc.com>
**Date** Wed 1/10/2024 9:59 AM
**To** OIG FOIA <FOIA@oig.doc.gov>

---

**From:** david nutraberryinc.com <david@nutraberryinc.com>
**Sent:** Tuesday, December 26, 2023 10:42 AM
**To:** OIG FOIA <FOIA@oig.doc.gov>
**Subject:** Re: complaint number 23-0564 Fw: Case Closure Notification

Hello,

Please see below

David M. Wishnick
805 Hibbard Rd.
Wilmette,  IL 60091

Thank you,

David
425 577 9020

---

**From:** OIG FOIA <FOIA@oig.doc.gov>
**Sent:** Tuesday, December 26, 2023 10:27 AM
**To:** david nutraberryinc.com <david@nutraberryinc.com>
**Subject:** RE: complaint number 23-0564 Fw: Case Closure Notification

Hi David,

Pursuant to Department of Commerce FOIA regulations at 15 C.F.R. § 4.4, FOIA requests "must include the requester's full name and a valid return address." Please provide this information.

Thank you,
Commerce OIG FOIA staff

---

**From:** david nutraberryinc.com <david@nutraberryinc.com>
**Sent:** Friday, December 22, 2023 11:47 AM
**To:** OIG FOIA <FOIA@oig.doc.gov>
**Subject:** complaint number 23-0564 Fw: Case Closure Notification

| CAUTION: External email. Do not click links or open attachments unless you recognize the sender and know the content is safe. |
| --- |

Hello,

I am writing to request a copy of complaint number 23-0564.

Please see the attached.

Please advise how to proceed.

Thank you,

David
425-577-9020

---

**From:** Compliance and Ethics <ComplianceandEthics@oig.doc.gov>
**Sent:** Friday, December 15, 2023 11:16 AM
**To:** david nutraberryinc.com <david@nutraberryinc.com>
**Subject:** Case Closure Notification

The Department of Commerce, Office of Inspector General has received the complaint you recently submitted to our Hotline. For additional information regarding your complaint, you may file a request with OIG pursuant to the applicable rules under the Freedom of Information Act (FOIA).  The FOIA rules are outlined on OIG's website, www.oig.doc.gov, under the "FOIA" link at the bottom of the main web page.  If you have questions about the FOIA process, you may contact the OIG FOIA Officer at (202) 482-5992 or FOIA@oig.doc.gov.

Thank you.

Compliance and Ethics Staff

**Exhibit B**

No acknowledgment of FOIA request DOC-OIG-2024-000049 (submitted 10 Jan 2024) was ever received.

# Exhibit C



**UNITED STATES DEPARTMENT OF COMMERCE**
Office of Inspector General
Washington, D.C. 20230

January 17, 2024

VIA E-MAIL

David M. Wishnick
805 Hibbard Rd.
Wilmette, IL 60091
david@nutraberryinc.com

RE: FOIA Request No. DOC-OIG-2024-000049

Dear Mr. Wishnick:

This letter is regarding your Freedom of Information Act (FOIA) request, tracking number DOC-OIG-2024-000049, received by the Department of Commerce, Office of Inspector General (OIG) on January 10, 2024, in which you seek the final report for complaint number 23-0564.

A search of records maintained by the OIG revealed that 23-0564 was referred to NIST with no response required to the OIG. The OIG does not have the requested records. In accordance with 15 C.F.R. §§ 4.5(a) we have referred your request to the National Institute of Standards and Technology (NIST) for processing and direct response to you. You may contact NIST at:

> National Institute of Standards and Technology
> Catherine S. Fletcher, FOIA & Privacy Act Officer
> 100 Bureau Drive, STOP 1710
> Gaithersburg, MD 20899-1710
> Email: foia@nist.gov

If you have any questions regarding your request, please contact me or Laura Main, Government Information Specialist, by phone at (202) 794-8066 or via e-mail at FOIA@oig.doc.gov.

Sincerely,

JENNIFER PIEL
Digitally signed by
JENNIFER PIEL
Date: 2024.01.17
14:48:10 -06'00'

Jennifer Piel
FOIA Officer

# Exhibit D



**David Wishnick <david.wishnick@gmail.com>**

## Freedom of Information Act Appeal – DOC-NIST-2025-000284

**Appeals, FOIA** <foiaappeals@doc.gov>                                         Fri, Apr 11, 2025 at 9:42 AM
To: David Wishnick <david.wishnick@gmail.com>, "Appeals, FOIA" <foiaappeals@doc.gov>
Cc: "caseworkwa09@mail.house.gov" <caseworkwa09@mail.house.gov>, "casework@cantwell.senate.gov"
<casework@cantwell.senate.gov>, "Daitch, Shayna (Murray)" <Shayna_Daitch@murray.senate.gov>,
"keelyn.bessmer@mail.house.gov" <keelyn.bessmer@mail.house.gov>, "casework@murray.senate.gov"
<casework@murray.senate.gov>

We have received your FOIA appeal and assigned it the following tracking number - DOC-InfoLaw-2025-000130.  Please
refer to this number when communicating with my office.

Thank you

Allyson Deitrick, Chief

Information Law Division

Office of the General Counsel

Room 5896

U.S. Department of Commerce
1401 Constitution Ave, NW
Washington, DC 20230
Office: (202) 482-3171

Mobile: (202) 322-2548

---

**From:** David Wishnick <david.wishnick@gmail.com>
**Sent:** Wednesday, April 9, 2025 12:59 PM
**To:** Appeals, FOIA <foiaappeals@doc.gov>
**Cc:** caseworkwa09@mail.house.gov; casework@cantwell.senate.gov; Daitch, Shayna (Murray)
<Shayna_Daitch@murray.senate.gov>; keelyn.bessmer@mail.house.gov; casework@murray.senate.gov
**Subject:** Freedom of Information Act Appeal – DOC-NIST-2025-000284

You don't often get email from david.wishnick@gmail.com. Learn why this is important

[Quoted text hidden]

Case: 1:25-cv-06905 Document #: 15 Filed: 08/28/25 Page 18 of 94 PageID #:180

18

**Exhibit E** |

David Wishnick <david.wishnick@gmail.com>

---

## Escalation – Overdue FOIA Appeals DOC-NIST-2025-000284 & 000286

---

**David Wishnick** <david.wishnick@gmail.com>                                   Sun, Jun 15, 2025 at 7:55 PM
To: NCormier@doc.gov
Cc: "Deitrick, Allyson (Federal)" <ADeitrick@doc.gov>, Ogis@nara.gov, caseworkwa09@mail.house.gov, "Gorbunova, Triniti"
<Triniti.Gorbunova@mail.house.gov>, casework@murray.senate.gov, casework@cantwell.senate.gov

Mr. Cormier,

Both of my FOIA appeals are now well past the 20-business-day statutory deadline, and I have not received any "unusual-circumstances" extension letter.

DOC-NIST-2025-000284 – submitted 9 Apr 2025 (45 + business days overdue)

DOC-NIST-2025-000286 – submitted 16 Apr 2025 (38 + business days overdue)

I have already (1) discussed the delay with Ms. Allyson Deitrick, (2) provided full case files to the Office of Government Information Services (OGIS) for mediation, and (3) notified congressional offices copied here.

Please provide—by close of business June 22, 2025—either:

A firm estimated completion date for each appeal, or

A written explanation of why further delay is necessary.

Why timely resolution matters
These appeals trace back to Impact Washington's refusal to provide cyber-security assistance under the Hollings Manufacturing Extension Partnership (MEP).

Congress created MEP under 15 U.S.C. § 278k expressly to help small and medium-sized manufacturers adopt technology and reduce risk—cybersecurity included. Denying those services to a HUB-Zone food-ingredient manufacturer (Nutraberry) conflicts with the program's statutory purpose and undermines the performance metrics NIST reports to Congress.

Your prompt action on these FOIA appeals is therefore critical not only for statutory compliance, but also for restoring confidence that MEP resources are distributed in accordance with their congressional mandate.

Thank you for your immediate attention.

Sincerely,

David Wishnick
Founder | Nutraberry
david.wishnick@gmail.com |
425-577-9020

**April 10, 2025**

**nutraberry™**          **Exhibit F**

**Nutraberry Inc.**
**1440 S. Jackson St.**
**Seattle, WA 98144**
**PO Box 82633, Kenmore, WA 98028**
**david.wishnick@gmail.com | 425-577-9020**

**To:** National Institute of Food and Agriculture Award, awards@usda.gov
**Award Number:** 2023-51402-39332

**Subject:** Request for Extension and Justification for Delays – USDA Award #2023-51402-39332

**Dear USDA Awards Team,**

I am writing to formally request an extension of USDA grant Award #2023-51402-39332, proposing a new end date of **06/30/2026**. Nutraberry has made substantial progress in advancing our USDA-funded objectives and remains committed to successfully completing our project. However, unexpected challenges related to cybersecurity breaches and systemic barriers have significantly delayed our timeline.

**Project Progress and Achievements:**

Prior to encountering these setbacks, Nutraberry achieved significant milestones:

- Successfully completed fermentation studies in collaboration with **Washington State University**, demonstrating the nutritional and functional benefits of our micronized defatted raspberry seed powders (DRSP).

- Validated commercial potential through our partnership with **King Arthur Baking Company**.

- Garnered strong industry recognition through successful engagements with leading global food brands including **Nestlé, Mars, and Mondelēz**.

**Unforeseen Challenges Impacting Timeline:**

Unfortunately, our project faced substantial hurdles due to two primary issues:

**1. Cybersecurity Breach:** Nutraberry suffered a cybersecurity breach that directly impacted project resources and timelines. This breach occurred following our exclusion from critical cybersecurity services normally available through Impact Washington under the Manufacturing Extension Partnership (MEP), funded by NIST. Despite our eligibility, access to these essential cybersecurity services was denied, resulting in unauthorized diversion of funds designated for collaborative research with **Washington State University and King's College**.

**April 10, 2025**



**Nutraberry Inc.**
**1440 S. Jackson St.**
**Seattle, WA 98144**
**PO Box 82633, Kenmore, WA 98028**
**david.wishnick@gmail.com | 425-577-9020**

We sought assistance and resolution from NIST, but responses have been inadequate, compounding operational setbacks and directly hindering our ability to meet project timelines.

2. Systemic and Competitive Challenges:
We recognize and deeply appreciate the broader industry goals and mission of the Upcycled Food Association (UFA). However, Nutraberry experienced notable difficulties related to fairness and transparency in UFA's initial beta certification rollout. While certification was freely awarded to FruitSmart—a subsidiary of Universal Corporation, historically rooted in the tobacco industry and publicly traded—our small, self-funded operation was excluded despite demonstrably superior technological capabilities validated by USDA-funded research. This outcome raised genuine concerns regarding systemic equity and fair access, particularly given FruitSmart's competitive position and financial backing. FruitSmart's vertically integrated model directly competes with Pacific Northwest fruit processors, limiting fruit processors incentive to sell fruit skins and seeds to FruitSmart—a critical resources for Nutraberry's upcycling innovations. These competitive inequities restrict collaboration opportunities and market access for Nutraberry, inadvertently hindering innovation and sustainable growth.

One justification provided for our exclusion was that additional points were given to businesses owned by people of color. However, the certification was ultimately awarded to FruitSmart—a Washington-based subsidiary of Universal Corporation, historically rooted in the tobacco industry and publicly traded on the New York Stock Exchange. FruitSmart lacks advanced milling technology, further highlighting the inequity of their selection over Nutraberry. Given FruitSmart's financial strength and their historical association with tobacco—a product widely known for disproportionately harming communities of color and historically profiting from enslaved labor—the decision sharply contradicts UFA's stated intent of supporting minority-owned businesses and promoting equity.

This issue is further compounded by the fact that UFA's certification program was indirectly funded by ReFED, an organization actively engaged through Memoranda of Understanding (MOUs) with federal agencies including USDA, FDA, and EPA. This federal affiliation raises additional concerns about systemic fairness and potential conflicts of interest in how such certifications and funding decisions are administered.

Moreover, FruitSmart's vertically integrated business model involves producing seedless fruit purees and juices, positioning them as direct competitors to nearly every fruit processor in the Pacific Northwest. Fruit processors thus have little incentive to supply

**April 10, 2025**



**Nutraberry Inc.**
**1440 S. Jackson St.**
**Seattle, WA 98144**
**PO Box 82633, Kenmore, WA 98028**
**david.wishnick@gmail.com | 425-577-9020**

FruitSmart with fruit skins and seeds—valuable resources that Nutraberry relies upon for its innovative upcycling processes. Awarding certification preferentially to FruitSmart effectively reinforces competitive inequities, limits collaborative opportunities, and directly restricts Nutraberry's access to critical market resources.

The practical consequence for Nutraberry has been substantial: we are compelled to undertake significant additional personal labor—such as bagging groceries or tutoring—to offset costs freely provided to a financially robust competitor. Such systemic biases undermine fair competition, innovation, and genuine economic inclusion, ultimately harming small businesses like ours and limiting the broader market's potential for sustainable growth.

**Strategic Adaptations and Positive Developments:**

Despite these setbacks, Nutraberry has identified and pursued promising strategic opportunities:

- Explored applying our advanced milling technology to peanut skins, inspired by the USDA Agricultural Research Service article "Peanut Skins: More than Meets the Eye". This pivot has propelled Nutraberry into becoming a finalist for the prestigious HudsonAlpha AgTech Investment Accelerator, reflecting significant market potential and broader impact.

- Accepted into the Nutrition Capital Network (NCN), a respected investment platform for health and nutrition innovators, and invited by NCN's Executive Director Michael Dovbish to present at the Spring Investor Meeting (April 30, 2025, in New York City). This recognition underscores the relevance and attractiveness of Nutraberry's USDA-supported innovations to strategic investors.

**Request Summary:**

- **Requested Extension:** Revised project completion date: **06/30/2026**

- **Justification:** Extension required due to cybersecurity breach and documented systemic barriers that significantly disrupted original timelines.

- **Commitment to Objectives:** Nutraberry remains fully dedicated to successfully meeting all original USDA grant objectives and leveraging strategic market validation to ensure impactful results.

**April 10, 2025**



**Nutraberry Inc.**
**1440 S. Jackson St.**
**Seattle, WA 98144**
**PO Box 82633, Kenmore, WA 98028**
**david.wishnick@gmail.com | 425-577-9020**

We greatly value USDA's continued support and partnership. If further information, clarification, or documentation is required, please let me know promptly.

Thank you for your thoughtful consideration of our request.

Respectfully,

*David Wishnick*

**David Wishnick**
Founder, Nutraberry Inc.
425-577-9020 | david.wishnick@gmail.com

ADAM SMITH
9TH DISTRICT, WASHINGTON

2264 RAYBURN HOUSE OFFICE BUILDING
WASHINGTON, DC 20515
(202) 225-8901

COMMITTEE ON ARMED SERVICES
RANKING MEMBER

**Congress of the United States**

**House of Representatives**

**Washington, DC 20515-4709**

DISTRICT OFFICE

15 SOUTH GRADY WAY, SUITE 101
RENTON, WA 98057
(425) 793-5180
TOLL FREE 1-888-SMITH09
http://adamsmith.house.gov
http://twitter.com/RepAdamSmith
https://www.facebook.com/RepAdamSmith

April 15, 2025

The Honorable Secretary Rollins
U.S. Department of Agriculture
1400 Independence Avenue, SW
Washington, DC 20250

Dear Secretary Rollins,

I writing in support of Nutraberry's request for a no-cost extension of its Small Business Innovation Research (SBIR) Phase 1 USDA grant – *Analyzing Nutritional Benefits of Micronized Defatted Berry Seed Powders Using an In-Vitro Model of the Human Gut Microbiome*. Due to unforeseen circumstances, Nutraberry is requesting to extend their award end date to June 2026. Nutraberry exemplifies our district's commitment to innovative manufacturing and supporting small businesses.

Nutraberry faced a cybersecurity incident involving a fraudster impersonating Washington State University staff. This incident has created hardship on Nutraberry preventing them from fulfilling their outlined objectives under this grant program. While they have demonstrated resilience and have made progress to achieving the goals outlined in their SBIR grant application, this no-cost extension would enable them to do the work they aimed to achieve. Given Nutraberry's commitment to innovating access to healthy food, extending this initiative is needed for continued economic and nutritional benefits.

Thank you for your attention to this extension request. I urge you to give this request full and fair consideration, following all applicable rules and regulations. If you have any questions regarding this request, please contact Triniti Gorbunova, Grants Coordinator, at 425-793-5180.

Sincerely,

Adam Smith
Member of Congress WA-09

**United States Department of Agriculture**
**Exhibit G**  National Institute of Food and Agriculture
L:25-cv-06905 Document #: 15 Filed 08/28/25 Page 24 of 94 PageID #:186
24

# AWARD FACE SHEET

| 1. Award No. | 2. Amendment No. | 3. Proposal Number | 4. Period of Performance | 5. Type of Instrument |
|---|---|---|---|---|
| 2023-51402-39332 | 5 | 2025-05836 | 07/01/2023 through 06/30/2026 | Grant |

| 6. Type of Action | 7. CFDA Number | 8. FAIN | 9. Method of Payment | 10. CRIS Number |
|---|---|---|---|---|
| Revision | 10.212 | 20235140239332 | ASAP 51402393325140223000 | 1030138 |

**11. Authority**:
15 U.S.C. 638, 100 STAT.3341, P.L. 97-219, as amended; and Sec. 101(a) of P.L. 99-591, Small Business Innovation Research Grants Program

| 12. Agency (Name and Address) | 13. Awardee Organization |
|---|---|
| Awards Management Division<br>National Institute of Food and Agriculture/USDA<br>805 Pennsylvania Ave Kansas City, MO 64105 | NUTRABERRY LLC<br>SEATTLE, WA 98114 |

| 14. Program Point of Contact: | Administrative Point of Contact: | 15. Project Director/Performing Organization |
|---|---|---|
| Junia Jean-Gilles Beaubru<br>Telephone: 301-852-1201<br>junia.jean-gillesbeaubrun@usda.gov | Heather Handeland<br>Telephone: 406-499-9970<br>heather.handeland@usda.gov | David Wishnick<br>Nutraberry LLC<br>Seattle, WA 98144-2023 |

**16. Funding:**

| | Federal | Non-Federal |
|---|---|---|
| Previous Total | $175,000.00 | $0.00 |
| + or - | $0.00 | $0.00 |
| Total | $175,000.00 | $0.00 |
| Grand Total | $175,000.00 | |

**17. Funds Chargeable**

| FY-TAS- FDC | Amount | FY-TAS-FDC | Amount |
|---|---|---|---|
| 23-1231502-51107 | $0.00 | | |

**18. Title of Proposal**
Analyzing Nutritional Benefits of Micronized Defatted Berry Seed Powders Using an in-vitro Model of the Human Gut Microbiome

## PROVISIONS

**This Award incorporates the following:**

1. The request contained in the letter dated 04.10.2025 has been reviewed by this office and the NIFA cognizant program official. NIFA approves the no-cost extension.

2. Refer to Block 4. "Period of Performance" for the new expiration date. Please refer to the Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards (2 CFR Part 400) at expiration of the grant for closeout procedures.

3. The July 2024 Small Business Innovation Research Program Terms and Conditions and the USDA/NIFA Agency-Specific Terms and Conditions shall supersede and replace the prior terms and conditions between the grantee and NIFA effective upon issuance of this amendment.

4. The Terms and Conditions referenced on this award states that a second or subsequent no-cost extension of time is permitted only when there are exceptional circumstances. Please refer to the Terms and Conditions if it is determined an additional extension is required and include a justification of circumstances precipitating this need.

5. Please be advised that all funds must be drawn down within 120 days of the expiration date.

6. Refer to Article 7 of the Special Terms and Conditions for 1890 Facilities Program, Section 1447, if additional extensions are required under this award. The information required in that Article should be submitted for consideration at least 60-days prior to the expiration date.

7. Failure to submit complete, accurate, and timely reports may result in possible award delays or enforcement actions. Federal Financial SF-425 forms are to be sent to awards@usda.gov. Project progress reports are to be completed in the REEport portal located at https://portal.nifa.usda.gov. Questions regarding access to REEport should be directed to electronic@usda.gov. Additional information regarding grant management and closeout can be found at: https://www.nifa.usda.gov/grants/lifecycle/post-award and https://www.nifa.usda.gov/grants/lifecycle/close-out .

8. Unless otherwise stated, all other Provisions on the initial Award Face Sheet and any amendments thereto remain in effect.

9. If you have questions concerning this action, contact the Award Management mailbox (awards@usda.gov) and cc' the Administrative Point of Contact listed above.

**Co-Project Director(s):**

Franck Carbonera (Washington State University)

## FOR THE UNITED STATES DEPARTMENT OF AGRICULTURE

This award, subject to the provisions above, shall constitute an obligation of funds on behalf of the Government. Such obligation may be terminated without further cause unless the recipient commences the timely drawdown of funds; such drawdowns may not exceed one year from issuance date of the award.

| Typed Name | Signature | Date |
|---|---|---|
| Tracy Nordstrom<br>Authorized Departmental Officer | TRACY.NORDSTROM | 06/04/2025 |

### Re: Nutraberry Further being sidelined

Turner Wyatt <turner@upcycledfood.org>

Mon 7/12/2021 9:01 AM

To: david nutraberryinc.com <david@nutraberryinc.com>



Hey David, I'm definitely not trying to insult you.

The point system mainly had to do with how many products or ingredients were being applied for, since that gives us and the CB the most "practice" for running the program. It's also took into consideration whether a business was a UFA member or not. Finally, it took into consideration whether the company was founded by a woman or person of Color to align with our value of inclusivity. I hope that helps.

One note I want to make is that dozens of members were not picked for beta; it's nothing personal. I wish you the absolute best of luck in your certification and in business David, truly. I think you have a great ingredient and I'm hopeful it will flourish.

Turner

On Sun, Jul 11, 2021 at 7:06 PM david nutraberryinc.com <david@nutraberryinc.com> wrote:

> Turner,
>
> Its insulting you would say that this has anything to with feelings and then not share the point system with me.
>
> This whole thing seems very self-serving.
>
> Can you please describe the point system?
>
> Do you have that spelled out ?
>
> David

> **From:** Turner Wyatt <turner@upcycledfood.org>
> **Sent:** Sunday, July 11, 2021 12:57 PM
> **To:** david nutraberryinc.com <david@nutraberryinc.com>
> **Subject:** Re: Nutraberry Further being sidelined
>
> Hey David,
>
> Sorry you feel that way. Beta had a long list of applicants and only a few spaces, so we came up with a point system to narrow it down. All beta participants were chosen because they scored highest on that point system. How long someone has been a member, or who they are owned by, we're not criteria.
>
> Now that open enrollment is here you are welcome to apply and still be one of the first.

Case: 1:25-cv-06905 Document #: 15 Filed: 08/28/25 Page 26 of 94 PageID #:188

Let me know if you have any other questions,
Turner


On Sun, Jul 11, 2021 at 7:50 AM david nutraberryinc.com <david@nutraberryinc.com> wrote:

Hello Turner,

Can you please help me understand how Tabacco owned Fruit Smart was included in the UFA beta certification program when Nutraberry was a UFA member well before Fruit Smart and have nearly identical inputs?

Thank you,

David
425-577-9020

--
Turner Wyatt
Chief Executive Officer
Upcycled Food Association
720-838-4243


--
Turner Wyatt
Chief Executive Officer
Upcycled Food Association
720-838-4243

# Exhibit I

| System Identifier | Customer Reference Number |
|---|---|
| 54773 | 2025-GREENJOBS |
| **Organization Name** | **Title of Opportunity** |
| Commerce, Dept. of | Green Jobs Grant Program 2025 |

**Description Of Opportunity**

The Department of Commerce is initiating this Request for Applications (RFA) to solicit proposals from those qualified and interested in grant funding for projects that demonstrated high-wage, clean job creation in Washington, provide risk reduction for investments in public and private infrastructure in order to increase a community's capacity for clean manufacturing, or provide investments in workforce development to attract and train the workforce required to grow the clean energy economy.

| Date Posted | Date Closed |
|---|---|
| 12/19/2024 | 1/20/2026 |
| **Estimated Initial Contract Value** | **Contact Name** |
| 500,000.00 | Serena Grimes |
| **Contact Phone** | **Contact Email** |
| (360) 725-2953 | Serena.grimes@commerce.wa.gov |

**Comm Codes**

936-28 - Energy Collecting Equipment and Accessories Maintenance and Repair
961-31 - Energy Comprehensive Performance Services (A Complete Conservation Program)
910-16 - Energy Conservation Services (Including Audits)
906-28 - Energy Conservation; New Energy Sources (Solar, etc.) - Architectural Services
578-33 - Energy Generating Devices; e.g., Modular Fuel Cells w/24, 48 or 125 vdc
925-34 - Energy Management Engineering
290-17 - Recycled Energy Collection Equipment and Supplies
290-65 - Solar Heat Collectors, Evacuated

**Counties**

Adams, Asotin, Benton, Chelan, Clallam, Clark, Columbia, Cowlitz, Douglas, Ferry, Franklin, Garfield, Grant, Grays Harbor, Island, Jefferson, King, Kitsap, Kittitas, Klickitat, Lewis, Lincoln, Mason, Okanogan, Pacific, Pend Oreille, Pierce, San Juan, Skagit, Skamania, Snohomish, Spokane, Stevens, Thurston, Wahkiakum, Walla Walla, Whatcom, Whitman, Yakima



Case: 1:25-cv-06905 Document #: 15 Filed: 08/28/25 Page 29 of 94 PageID #:191

29

 Outlook      # Exhibit J

---

## Re: ZFWC Member Survey Follow Up

---

**From** david nutraberryinc.com <david@nutraberryinc.com>

**Date** Wed 3/12/2025 2:49 PM

**To** Zero Food Waste Coalition <zfwcoalition@gmail.com>


Hi Yvette,

I appreciate your response, but this is not about asking ReFED to contact HudsonAlpha. In fact, I would rather you not reach out at all. Up to this point, I have not seen the integrity or leadership that this issue demands. The concerns you've raised seem less about solving real challenges and more about preserving the status quo. I would like to believe that this can change, but actions—not words—will determine that.

You say the Coalition does not support singular businesses, yet:

- ReFED awarded grant funding to the Upcycled Food Association (UFA).
- UFA then gave FruitSmart a free upcycled certification—while denying the same to Nutraberry.
- UFA claimed they awarded points to "people of color," yet still granted the free certification to FruitSmart—a company owned by Universal Corporation, a publicly traded entity on the New York Stock Exchange.
- Universal Corporation began as Universal Leaf Tobacco Company in 1918, consolidating several American tobacco merchants.
- It's important to recognize that the tobacco industry in the United States has deep historical ties to enslaved labor. During the 17th to 19th centuries, enslaved individuals were extensively used in tobacco cultivation, contributing significantly to the industry's growth and profitability.
- The very system UFA claims to want to dismantle, they actually reinforced.
- Meanwhile, Nutraberry, an independent, self-funded company pioneering true upcycling innovations, was denied.
- This is particularly egregious because FruitSmart is part of our supply chain and directly impacts our business.

This isn't just a historical footnote—it's an extension of the past into the present. Just as we are shaped by our experiences, the systems we live in are shaped by the structures that came before. ReFED, UFA, and others are not dismantling inequitable systems; they are preserving and reinforcing them.

And let's talk about who funds ReFED.

- Steve Ballmer just gave ReFED $15 million.
- Now, magically, the ReFED Food Waste Conference is being held in Seattle.
- The priority is clearly protecting your money, not actually supporting impactful solutions.
- It seems more about keeping the rich rich than about merit—something that becomes even more obvious given that we are in Seattle.
- While Ballmer's wealth and influence dictate who gets funding, I've actually worked working-class jobs in this city (Seattle)—
  - I cashiered **over 7 years** at Whole Foods across from Amazon HQ, bagging groceries.

- - I scanned products containing ingredients that I personally thought of, built the supply chain for, manufactured, characterized, sold to a distributor, and then it ended up on the shelf at Whole Foods—where I scanned the product and put it into a bag for a customer.
  - I worked for **five years** at an international public high school with a high population of East African refugees—where real resilience is built, not inherited.
  - I worked as a sanitor at a bakery, cleaning the very facilities that feed the system they claim to want to change.
- Yet instead of rewarding real innovation and hard work, ReFED prioritizes wealth and exclusivity— ensuring that power stays exactly where it already is.

Then there's Anna Hammond, CEO of Matriark Foods.

- She served on the board of the Upcycled Food Association (UFA) from 2020 to 2022.
- She is positioned as an emerging leader in food waste reduction, yet when I reached out to her multiple times about Google Seattle's event on upcycled food, she refused to acknowledge my emails.
- If she's truly a leader, why does she ignore those actually solving food waste issues? Or is she just another token figurehead loyal to the funding sources that maintain the status quo?

So let's be clear:

- ReFED, ZFWC, and other industry players choose who gets amplified and who gets shut out.
- The claim that this is about neutrality is false—this is about controlling the narrative and protecting your funding.

I don't need you to reach out to HudsonAlpha—I need you to stop gatekeeping and do the right thing. Whether or not ZFWC is willing to change remains to be seen.

*"Elie Wiesel said, 'The opposite of love is not hate, it's indifference.'* Indifference allows injustice to persist—not through active harm, but through passive neglect. It is what enables systems of exclusion to thrive, not because people openly conspire to maintain them, but because those who have the power to act simply choose not to.

This is exactly what is happening in food systems today. When real solutions are ignored in favor of reinforcing existing power structures, the waste isn't just in food—it's in opportunity, progress, and impact.

If you choose to continue excluding Nutraberry and other innovators actually solving food waste issues, you aren't just failing to fix the problem—you are actively ensuring that those with power keep it, while those doing the work are left behind. That is what indifference looks like in practice. The only question is whether ZFWC will continue down that path—or if it will finally decide to lead."

Best,
David

---

**From:** Zero Food Waste Coalition <zfwcoalition@gmail.com>
**Sent:** Wednesday, March 12, 2025 1:13 PM
**To:** david nutraberryinc.com <david@nutraberryinc.com>
**Subject:** Re: ZFWC Member Survey Follow Up

Mail - david@nutraberryinc.com - Outlook

Case: 1:25-cv-06905 Document #: 15 Filed: 08/28/25 Page 31 of 94 PageID #:193

Hi David,

I'm hopping in on behalf of the ZFWC Steering Committee.

It's great to hear that the HudsonAlpha Accelerator is interested in supporting Nutraberry. We're always happy to hear food waste solutions are getting the recognition they deserve. I'm hoping you can clarify your specific request – are you requesting that ReFED get in touch with the HudsonAlpha Accelerator to express their support for Nutraberry? If so, we can pass that information along to our partners at ReFED.

As a Coalition, we do not express support for singular businesses even though we are supportive of the work you do. The goal of our Coalition is to advance policy, and expressing support for a singular business would fall outside of our Coalition's goals and charter.

Best,
Yvette

**YVETTE CABRERA** (SHE/HER)
*Director, Food Waste*
**NATURAL RESOURCES DEFENSE COUNCIL**
40 W. 20TH ST
NEW YORK, NY 10011
NRDC.ORG

On Thu, Mar 6, 2025 at 11:57 AM david nutraberryinc.com <david@nutraberryinc.com> wrote:

> Hi Nina,
>
> Thank you for your response and for acknowledging the systemic barriers many organizations face in accessing funding and participation in key conversations.
>
> There is a responsible way to drive change—where solutions that are already working are included, amplified, and supported. And then there is an irresponsible way—where organizations position themselves as gatekeepers, limiting participation to only those within a select network, while real innovators doing the work are sidelined.
>
> I had the privilege of meeting Elie Wiesel, and one of the most powerful ideas he shared was that *"the opposite of love is not hate, it's indifference."* Indifference is what allows suffering to persist—not because of active harm, but because of passive neglect. The same holds true in food systems: when real solutions are ignored, the waste isn't just in food—it's in opportunity, progress, and impact.
>
> Since our last conversation, Nutraberry has advanced to the final round of the HudsonAlpha AgTech Investment Accelerator. The overwhelming interest from Huntsville is because Alabama is one of the largest peanut-growing states in the country, and Nutraberry directly solves a major peanut processing inefficiency. The USDA itself has highlighted this opportunity in "Peanut Skins: More Than Meets the Eye", yet food waste organizations in Washington State have ignored the innovation needed to act on it.
>
> The reality is this: Food waste isn't just an environmental issue—it's an economic and equity issue. The choice to exclude working solutions isn't just about funding; it's about who gets to

participate in the conversation, who gets to scale, and who gets access to the opportunities that[32] define the future of sustainable food systems.

Nutraberry will continue to operate, scale, and succeed—whether or not Washington-based organizations recognize our contributions. But the question remains: How can an industry committed to reducing food waste justify shutting out those actively working to solve the problem?

Best,
David

---

**From:** Zero Food Waste Coalition <zfwcoalition@gmail.com>
**Sent:** Wednesday, March 5, 2025 9:13 AM
**To:** david nutraberryinc.com <david@nutraberryinc.com>
**Subject:** Re: ZFWC Member Survey Follow Up

David,

Thank you for sharing this additional context regarding your engagement with ReFED. While ReFED is a founding member, we are not able to speak to or weigh in on their individual business opportunities including grants. Each of our founding members engages in this Coalition within the context of domestic food loss and waste policies rather than all business operations. If there are federal or state food loss and waste policies you would like to flag for us, please let us know.

Thank you!
Nina

On Sat, Feb 22, 2025 at 12:29 PM david nutraberryinc.com <david@nutraberryinc.com> wrote:

> Dear Nina,
>
> Thank you for your continued engagement on these issues. At Nutraberry, we've been pioneering upcycling not only with berry byproducts but also by focusing on peanut skins—a resource with significant potential in markets beyond the Pacific Northwest. Our technology is proven, with over 100 fulfilled orders, including international orders from New Zealand and Italy. This work has been validated by our discussion with the HudsonAlpha AgTech Accelerator powered by gener8tor and supported by insights from the USDA article "Peanut Skins: More Than Meets the Eye."
>
> In a polarized environment, we can bridge these gaps through business. Our appeal comes from the fact that the Alabama-based HudsonAlpha group sees real value in our proposal to upcycle peanut skins—an opportunity that aligns with agricultural and economic interests beyond the Pacific Northwest. At the same time, gener8tor's ability to feature pragmatic voices like David Beasley suggests that ReFED/ZWFC may benefit from collaborating more closely with them. We would like to be the means to help facilitate that collaboration.
>
> Given that ReFED is a founding member of the Zero Food Waste Coalition, this is an opportunity for action. You can find our full ReFED application and Appendix here, which includes robust letters of support to demonstrate our commitment and the tangible impact of our work.

33

We're not looking for favors—we are bringing a proven, scalable solution to the table. Nutraberry has already built a fully operational, self-funded company that aligns with ReFED and ZFWC's mission. The opportunity is here, and we are ready to collaborate.

I look forward to your thoughts.

Best regards,
David Wishnick
Founder, Nutraberry, LLC
425-577-9020

Attachment: Karen Thompson Email

---

**From:** Zero Food Waste Coalition <zfwcoalition@gmail.com>
**Sent:** Thursday, February 20, 2025 12:37 PM
**To:** david nutraberryinc.com <david@nutraberryinc.com>
**Subject:** Re: ZFWC Member Survey Follow Up

David,

Thank you for your thoughtful response and patience. Again, we appreciate you taking the time to discuss this important topic with us.

While we aren't able to comment regarding the specific examples you shared about UFA, we understand the overall concern regarding the difficulties of being left out of key conversations. As we've mentioned, while we are not able to provide direct support at the state level, we continue to have internal discussions about improving the inclusion of diverse organizations in discussions of food loss and waste policy. Particularly given recent federal events, we are confronted with how increasingly difficult access to funding and leadership conversations are, and trying to navigate the quickly shifting funding environment under the current administration. In an effort to prioritize ZFWC member concerns, we are actively trying to understand how the recent funding barriers are impacting members to identify opportunities we, as a Coalition, can take to address these negative impacts over the coming years. While I recognize this does not address your specific example, I hope it provides an example of how we are trying to remove barriers for a wide array of organizations in this new environment that we transparently are also continuously learning to navigate.

As you said, it's not a straightforward answer, but we continue exploring ways to improve the Coalition's inclusivity while balancing individual interests within the current political climate. We appreciate your openness to raising the concern and having this discussion.

On Sat, Feb 1, 2025 at 11:43 AM david nutraberryinc.com <david@nutraberryinc.com> wrote:

Hi Nina,

Case: 1:25-cv-06905 Document #: 15 Filed: 08/28/25 Page 34 of 94 PageID #:196

I appreciate your time in responding and clarifying the Coalition's scope. I understand that the Zero Food Waste Coalition doesn't promote individual businesses or influence state grant allocations, and I respect that.

However, my concern is not about funding—it's about whether the Coalition is truly upholding its mission of preventing food waste in a way that is fair and inclusive. Nutraberry is not just an idea —we are a self-funded manufacturing company, actively producing upcycled food ingredients. We have fulfilled over 100 orders, running operations 24 hours a day for six weeks straight to meet demand. During that time, we hired individuals on work release, helping them re-enter the workforce, and I personally worked the night shift to keep production running.

During the day, I worked as a cashier at Whole Foods Market across from Amazon HQ, and one day, I scanned a product, an EO Body Scrub product with our 40-60 blueberry scrub, and placed it into a bag that contained ingredients I had manufactured myself. This moment reinforced the full-circle nature of what we are building—real solutions, in the real world, actively reducing food waste and putting those ingredients back into the food system.

But at the same time, it made no sense. How is it that I, someone actively manufacturing upcycled ingredients, was working as a cashier for over seven years, while the same organizations claiming to build a circular economy were boxing me out of their plans? These groups advocate for sustainability, food waste reduction, and circular economies, yet they are excluding me even though I am actually doing the work.

More than that, wasting food is an insult—not just to the environment, but to the people who work to grow and harvest it. Behind every piece of food that ends up in the trash are the farmers, laborers, and workers who put their time, effort, and resources into growing it. Reducing food waste isn't just about efficiency—it's about respecting the people and ecosystems that sustain us. Yet, the way this movement is currently structured, those of us working to make that happen are being pushed aside in favor of organizations that are more focused on their own positioning than on making a real impact.

My last job in Seattle was at Franz Bakery, a large commercial bakery that makes the buns for Dairy Queen, Kroger, Burger King, and others. I worked in sanitation, and every day, I would study Franz Bakery's Sanitation Master Plan, which was posted outside the manager's office. Understanding sanitation and food safety at scale became an invaluable experience when I built Nutraberry's manufacturing process.

But my awareness of food waste and injustice didn't start there. I backpacked through rural El Salvador, where I saw firsthand where our garbage ends up—not just food waste, but clothing, packaging, and discarded items that shape the lives of people who had no say in receiving them. I saw children wearing shirts from American sports teams they had never heard of, a reminder that our waste becomes their reality, regardless of its usefulness or meaning to them. I also visited the site where Óscar Romero was last alive. That experience deepened my understanding of how broken systems perpetuate harm—whether in food, waste, or power structures. It was one of the many reasons I started Nutraberry—to be part of a real, scalable solution rather than just talking about change.

We have done this without external investment—my business partner liquidated his Microsoft stock—$1 million of his own money—to fund our work, and I pulled out my 401K to make this happen. We did this with the expectation that if we developed a real solution, we would be treated fairly and paid for that solution—money for value. Instead, we have been boxed out while

these organizations appear to be more focused on self-promotion than actually solving food[35] waste problems.

Yet, despite all this, we have been excluded from key conversations and opportunities where our contributions should be valued.

For example, in late 2019—right when the Upcycled Food Association (UFA) was forming—I was already actively manufacturing upcycled food ingredients and sent samples to Dr. Jonathan Deutsch at Drexel University, who later became a founding member of the UFA. But more importantly, I actively sought him out—I read about his work on choosing the term 'upcycled' and his research on food waste, and that's how I learned about him. I reached out to him. I found him —he didn't find me.

This means Nutraberry was not only already doing the work before the UFA existed, but we were knocking on the door, directly engaging with a founding member, and yet that door was never opened. When the UFA launched, we were not included as a founding member, despite our contributions to the movement.

Additionally, Impact Washington, a state-funded organization whose mission is to support small manufacturers with services like cybersecurity, certification assistance, and scaling support, denied Nutraberry services despite our clear eligibility. Their funding comes from the National Institute of Standards and Technology (NIST) Manufacturing Extension Partnership (MEP), which explicitly states that its goal is to support small and medium-sized manufacturers (SMMs) with cybersecurity preparedness and technical assistance.

- When we sought ISO 22000 certification support, we were denied.
- When we sought cybersecurity services, we were denied.
- Despite being a Washington-based manufacturer actively creating sustainable solutions, we were locked out of critical services that were supposed to be available to businesses like ours.

The consequences of this exclusion have been severe—not just for Nutraberry, but for the entire upcycled food movement. Nutraberry was hacked, and USDA grant funds were stolen by fraudster impersonating college personnel working on our project. This theft of federal funds was devastating—not just financially, but because it directly undermined our ability to carry out the work that organizations like the Zero Food Waste Coalition claim to support.

So, my question is: How does the Coalition ensure that small, self-funded manufacturers—who are actually executing on the Coalition's mission—aren't systematically left out? If the Coalition is truly committed to being impact-driven and equitable, it needs to go beyond rhetoric and actively remove barriers for organizations that align with its mission but aren't already part of the "inner circle."

This is not about self-promotion—it's about fairness and ensuring that power is not being abused to exclude real innovators who have put their own money, time, and work into solving the very problems the Coalition claims to address.

I don't expect an easy answer, but I do believe this is an important conversation worth having.

Best,

David
425-577-9020

Nutraberry Videos:
1: Here 2: Here 3: Here

Filled PO's here
Marketing folder here
Company Documents here

---

**From:** Zero Food Waste Coalition <zfwcoalition@gmail.com>
**Sent:** Friday, January 31, 2025 2:21 PM
**To:** david nutraberryinc.com <david@nutraberryinc.com>
**Subject:** ZFWC Member Survey Follow Up

Hi David,

I hope January has been treating you well! I am Nina, a Zero Food Waste Coalition steering committee member and serving as a co-chair of the member engagement and federal working groups. We are finally getting to follow ups from the end of year member survey.

I first want to say thank you for taking the time to respond to the Coalition's end of year survey and share your feedback.

Your frustration is clear. I know you've been in touch with Tori and from your survey responses it seems like you may be asking for something that is not within the scope of the Zero Food Waste Coalition. The Coalition does not promote individual businesses and we do not have influence over how Washington state chooses to issue grants. Pending capacity, we sometimes provide our members and partners with technical assistance interpreting legislation or providing feedback on policy resources, but we are not equipped to provide business-specific technical assistance on founding, funding, or growing a business. Our goal is to bring together groups from across sectors working on food waste reduction to advocate for policies, share resources, and build connections.

If you have a specific request for the Coalition to provide feedback on a piece of food loss and waste policy our State Co-Chairs would be happy to consider it pending availability. We want to support our members to the extent we can, but please understand that there are limitations to our abilities.

My best,
Nina

--



**Nina Sevilla**
she/her

zerofoodwastecoalition.org

zfwcoalition@gmail.com

Case: 1:25-cv-06905 Document #: 15 Filed: 08/29/25 Page 37 of 94 PageID #:199

 Outlook

# Exhibit K

## Fw: NextCycle Washington Renew Seed Grant Notification

| | |
|---|---|
| **From** | david nutraberryinc.com <david@nutraberryinc.com> |
| **Date** | Fri 2/23/2024 8:44 AM |
| **To** | millie.piazza@ecy.wa.gov <millie.piazza@ecy.wa.gov> |

📎 4 attachments (8 MB)
No_Award45150043 (1).pdf; Gmail - Thanks for your work! (2).pdf; IMG_1205 (1).jpg; IMG_1205.jpg;

**From:** david nutraberryinc.com <david@nutraberryinc.com>
**Sent:** Tuesday, February 20, 2024 10:20 AM
**To:** DOH EPH OEPHS Environmental Justice <envjustice@ejc.wa.gov>
**Subject:** Fw: NextCycle Washington Renew Seed Grant Notification

I spoke to somebody that is on the Environmental Justice Council that worked for the EPA, who said whenever they declined a grant proposal they offered feedback

I never had any feedback from either:

Precycle (3 years in a row)
Nextcycle (2 years in a row)
WSDA (2 years in a row)
WA Department of Commerce - 1 year

Attached is the no award for 2022.  Received the same letter from WSDA for 2023.  They say in the letter they will follow up, but never did.

Shortly after the 2022 letter, I applied for the highly competitive USDA STTR/SBIR Phase I and was awarded the grant, which was 20x times greater than PreCycle and 10x greater than Nextcycle, but less than WSDA and Department of commencers.

This put is a position to win the Evergreen Manfacturing grant, and was denied that with nothing.

The idea is, if someday burns a cross on your front lawn, you don't go to the sheriff's office, you go to the federal government.  This is pragmatic since the sheriff's office likely helped build the cross to burn on your front law.

The PNW, though has different tactics than southern Mississippi, the ends are the same. They carve you out, step on you, and simply exclude you from making a living.  I am currently and instructor at Brighmont Academy and read the letters in class that came out of WA State during this time period and they seem to be the same now (2024).

39

I attached a thank you letter from Chief Sealth Seattle.  I don't like to broadcast this, but being forced to do it to reflect my own character. I also bagged groceries at Whole Foods across the Amazon HQ for 7 years while building my company (attached photos of a trade show I just went to).

The rules are there to stop people form cheating and there is a price for having values.

WA State government are cheaters and liars with no values other than greed, ignorance and hatred if you point any shortcoming.

They ruined my life and burned a cross on my front lawn.

David

---

**From:** david nutraberryinc.com <david@nutraberryinc.com>
**Sent:** Thursday, July 20, 2023 11:34 AM
**To:** Bryce Hesterman <bhesterman@Recycle.com>
**Cc:** Hertz, Harry S. (Assoc) <harry.hertz@nist.gov>
**Subject:** Re: NextCycle Washington Renew Seed Grant Notification

Hello Bryce,

Just got back from Insitute of Food Technology (IFT) First National Expo.

There were a lot of other companies doing similar processes, but none that have bootstrapped themselves as far as us.  This company raised $65 million as an example

https://www.bioveritas.com/post/upcycling-food-is-really-one-of-the-biggest-opportunities-facing-the-food-industry

It is my understanding that Nextcycle was to support the WA State circular economy and what we purchase, process and repurpose into the food system comes out of the ground in WA State and is thrown away in WA State.

Reducing food waste is a major part of global warming and with unconciousable levles of starvation our scaled and exisiting business should have been included in Nextcycle.

https://www.scientificamerican.com/article/massively-reducing-food-waste-could-feed-the-world/

We met with Joe Brotherton who said to me he wanted a pound of flesh from me.  This is only one example of my experience

Over the past ten years, I have found the culture of the people you work with disgusting, toxic, and frightening.

Please do send me the comments from the Nextcycle judges so that I can understand what they thought about our applcaiton.

Thank you,

David
425-577-9020

---

**From:** Bryce Hesterman <bhesterman@Recycle.com>
**Sent:** Friday, July 7, 2023 12:40 PM
**To:** david nutraberryinc.com <david@nutraberryinc.com>
**Subject:** RE: NextCycle Washington Renew Seed Grant Notification

Hi David,

I haven't forgotten. I'm awaiting feedback from someone who has been out of office to understand the extent of information we have to share.

——

# BRYCE HESTERMAN
Senior Consultant | RRS | RECYCLE.COM

---

**From:** david nutraberryinc.com <david@nutraberryinc.com>
**Sent:** Thursday, July 6, 2023 6:23 AM
**To:** Bryce Hesterman <bhesterman@Recycle.com>
**Cc:** Hertz, Harry S. (Assoc) <harry.hertz@nist.gov>
**Subject:** Re: NextCycle Washington Renew Seed Grant Notification

Hello Bryce,

As discussed, when we spoke, please send comments on Nutraberry's application, total points, and distribution of teams points and list of those accepted into Nextcycle.

Thanks,

David
425-577-9020

---

**From:** Bryce Hesterman <bhesterman@Recycle.com>
**Sent:** Monday, June 26, 2023 6:05 PM
**To:** david nutraberryinc.com <david@nutraberryinc.com>
**Cc:** Hertz, Harry S. (Assoc) <harry.hertz@nist.gov>
**Subject:** RE: NextCycle Washington Renew Seed Grant Notification

Hi David,

Yes, we are on for tomorrow.

The criteria was clearly listed on the last page of the application
https://static1.squarespace.com/static/61b2e055189d1a240b21a4c0/t/632b222e5e7f125a845cfcff/166377

Case: 1:25-cv-06905 Document #: 15 Filed: 08/28/25 Page 41 of 94 PageID #:203

1194758/NCWA+Renew+Seed+Grant+Application.pdf

Best Regards,

Bryce

—

# BRYCE HESTERMAN

Senior Consultant | RRS | RECYCLE.COM

917.520.0555 | bhesterman@recycle.com

---

**From:** david nutraberryinc.com <david@nutraberryinc.com>
**Sent:** Monday, June 26, 2023 3:59 PM
**To:** Bryce Hesterman <bhesterman@Recycle.com>
**Cc:** Hertz, Harry S. (Assoc) <harry.hertz@nist.gov>
**Subject:** Re: NextCycle Washington Renew Seed Grant Notification

Hello Bryce,

Please confirm we are connecting tomorrow.

I would prefer you outline what is meant by "a better program *fit from the selected teams based on the criteria that was developed."*

In the email sent by you here ?

 What do you mean by fit?  What are the developed criteria?

Dr. Hertz is cc'ed as I connected with him about precycle where Washington State Law was clearly undermined too.

I will plan to call you on your phone and hope Dr. Hertz is able to connect with you as well.

Thank you,

David
425-577-9020

---

**From:** david nutraberryinc.com <david@nutraberryinc.com>
**Sent:** Friday, June 23, 2023 10:01 AM
**To:** Bryce Hesterman <bhesterman@Recycle.com>
**Subject:** Re: NextCycle Washington Renew Seed Grant Notification

Hello Bryce,

Before we speak, can you please elaborate on the below comment in the email sent by you  here ?

a better program *fit from the selected teams based on the criteria that was developed.*

 What do you mean by fit?  What are the developed criteria?

For transparency, I have been speaking with Dr. Harry Hertz from the NIST about my complaint, as they felt there was merit and added additional information as result of the correspondence you were cc'ed on with Amber.

David
425-577-9020

---

**From:** Bryce Hesterman <bhesterman@Recycle.com>
**Sent:** Wednesday, June 21, 2023 4:41 PM
**To:** david nutraberryinc.com <david@nutraberryinc.com>
**Subject:** RE: NextCycle Washington Renew Seed Grant Notification

Hi David,

Yes, that works.

Thanks!

Bryce

——

# BRYCE HESTERMAN
Senior Consultant | RRS | RECYCLE.COM
917.520.0555 | bhesterman@recycle.com

---

**From:** david nutraberryinc.com <david@nutraberryinc.com>
**Sent:** Wednesday, June 21, 2023 2:31 PM
**To:** Bryce Hesterman <bhesterman@Recycle.com>
**Subject:** Re: NextCycle Washington Renew Seed Grant Notification

Does 4 pm PT on Tuesday June 27th work?

Thanks,

David

---

**From:** Bryce Hesterman <bhesterman@Recycle.com>
**Sent:** Wednesday, June 21, 2023 3:44 PM
**To:** david nutraberryinc.com <david@nutraberryinc.com>
**Subject:** RE: NextCycle Washington Renew Seed Grant Notification

yes

——

# BRYCE HESTERMAN
Senior Consultant | RRS | RECYCLE.COM
917.520.0555 | bhesterman@recycle.com

**From:** david nutraberryinc.com <david@nutraberryinc.com>
**Sent:** Wednesday, June 21, 2023 1:41 PM
**To:** Bryce Hesterman <bhesterman@Recycle.com>
**Subject:** Re: NextCycle Washington Renew Seed Grant Notification

Are those times PTs?

Sent from my Verizon, Samsung Galaxy smartphone
Get Outlook for Android

**From:** Bryce Hesterman <bhesterman@Recycle.com>
**Sent:** Wednesday, June 21, 2023 3:40:10 PM
**To:** david nutraberryinc.com <david@nutraberryinc.com>
**Subject:** RE: NextCycle Washington Renew Seed Grant Notification

Hi David,

How does your schedule look next Wed? I'm free anytime after 10 except 1-1:30pm.

Best Regards,


Bryce

—

# BRYCE HESTERMAN
Senior Consultant | RRS | RECYCLE.COM
917.520.0555 | bhesterman@recycle.com

**From:** david nutraberryinc.com <david@nutraberryinc.com>
**Sent:** Wednesday, June 21, 2023 1:27 PM
**To:** Bryce Hesterman <bhesterman@Recycle.com>
**Cc:** JD Lindeberg <jdl@recycle.com>
**Subject:** Re: NextCycle Washington Renew Seed Grant Notification

Hello Bryce,

Thought to follow up about connecting.

Thank you,

David


**From:** Bryce Hesterman <bhesterman@Recycle.com>
**Sent:** Monday, June 12, 2023 10:37 AM
**To:** david nutraberryinc.com <david@nutraberryinc.com>
**Subject:** Automatic reply: NextCycle Washington Renew Seed Grant Notification

Hello,

Case: 1:25-cv-06905 Document #: 15 Filed: 08/28/25 Page 44 of 94 PageID #:206

Thanks for your email.  I'm traveling from 6/4-6/16 and will be checking email periodically.  I'll respond to your message as soon as possible.

Best Regards,

Bryce

Best Regards,

Bryce

 Gmail   **Exhibit L**

# Final Decision - HudsonAlpha AgTech Accelerator 🌱

4 messages

---

**Marco | HudsonAlpha AgTech Accelerator** <marco.kimpfler@gener8tor.com>          Tue, Apr 29, 2025 at 10:13 AM
To: david.wishnick@gmail.com
Cc: christopher@gener8tor.com

Hi David,

First, thank you for applying to the HudsonAlpha AgTech Accelerator powered by gener8tor and going through the interview process. We have been intrigued by the founders and startups we have seen throughout the process, and we enjoyed learning more about Nutraberry.

We also want to thank you for your patience while we worked through a longer-than-expected selection process on our end. We recognize the time and effort involved in participating in interviews and waiting for updates, and we truly appreciate your understanding as we worked toward a final decision.

After long deliberation, we have chosen not to invest in your venture at this time.

It was a difficult decision, and this is by no means an indication of the strength of your business but rather the strength of the applicant pool. We reviewed over 250 applications for this year's cohort with lots of very strong candidates.

We have the utmost respect for entrepreneurs and appreciate all your hard work. We'd love to hear about Nutraberry as you progress. For what it's worth, nearly every class has a company who received a temporary no in a previous application cycle.

We truly appreciate the enersgy and enthusiasm you brought to our interviews, as well as the thoughtful research you put into applying your technology to peanuts—it was great to see your dedication and innovation!

We also recognize the effort you put into providing extensive documentation. To make an even stronger impact, consider tailoring the information to your audience by distilling key points—sometimes, clarity and focus can be even more powerful than volume.

Additionally, we appreciate your transparency about how you plan to use the funds. While we understand the importance of legal matters, we prioritize investments that directly drive future growth and innovation.

We're excited to see how you continue to develop your work!

If you would like to have a more detailed discussion about your application, please feel free to sign up for an office hour time using this link.


Thank you again for your application, and we wish you all the best.


Sincerely,

Marco and the HudsonAlpha AgTech Accelerator Team

---

**David Wishnick** <david.wishnick@gmail.com>          Tue, Apr 29, 2025 at 10:53 AM
To: Marco | HudsonAlpha AgTech Accelerator <marco.kimpfler@gener8tor.com>
Cc: christopher@gener8tor.com

Hi Marco,

I appreciate your response and understand your decision, though I'd like to respectfully clarify a couple of critical points.

Nutraberry has tangible, immediate commercial demand—we have active orders ready to fill and ongoing discussions with numerous investors. One investor has explicitly expressed interest in taking the lead in funding our SAFE round. Moreover, our USDA grant was leveraged strategically to validate our innovation and support immediate growth, directly enhancing—not detracting from—our market readiness and viability.

Additionally, thanks to Dean at HudsonAlpha's insights and support, we've connected with numerous investors and are currently in the position of turning down orders, including significant opportunities from Italy, where we were explicitly advised we could triple our pricing, clearly demonstrating robust market interest and validation.

To clarify, we do not necessarily need to backfill the USDA funds, as we have an approved extension for one year and the flexibility to extend it further if needed. Regarding fueling demand, Nutraberry was invited to the Nutrition Capital Network Spring Investor Meeting and would have allocated funds to attend had the decision-making process not been significantly delayed. However, we remain positioned to attend the Ingredient Technology Investor Meeting in October, emphasizing our readiness to engage investors and drive growth.

Given these facts, I believe Nutraberry's market position, growth trajectory, and strategic alignment have perhaps been underestimated. I would appreciate your advice on whether scheduling a call would be productive at this point, as I'm concerned superficial reasons may obscure genuine evaluation.

Thank you again—I hope we can ensure mutual clarity on these important details.

Best regards,
David Wishnick
Founder & CEO, Nutraberry
(425) 577-9020 | david@nutraberryinc.com
[Quoted text hidden]

---

**Marco Kimpfler** <marco.kimpfler@gener8tor.com>        Tue, Apr 29, 2025 at 11:07 AM
To: David Wishnick <david.wishnick@gmail.com>
Cc: Christopher Udall <christopher@gener8tor.com>

Hi David,

Thank you for your follow-up and for taking the time to share more about Nutraberry's progress.

I want to assure you that we conducted a thorough and deliberate review of all applications in our selection process. Each applicant was evaluated across a range of criteria by multiple reviewers, and our decisions reflect a comprehensive assessment of fit within the scope and objectives of our accelerator.

While we acknowledge the momentum you've outlined, our decision stands, and we will not be moving forward with Nutraberry in this cohort. That said, our decision regarding the accelerator does not impact your ability to explore collaboration with HudsonAlpha or its affiliates separately, should there be mutual interest.

We appreciate your interest and wish you continued success in pursuing your goals.

Best regards,

Marco

[Quoted text hidden]

---

**David Wishnick** <david.wishnick@gmail.com>        Tue, Apr 29, 2025 at 11:50 AM
To: Marco Kimpfler <marco.kimpfler@gener8tor.com>
Cc: Christopher Udall <christopher@gener8tor.com>

Hi Marco,

Thank you for the prompt follow-up and for providing further clarity on your process and criteria. I genuinely appreciate the time your team invested in evaluating Nutraberry.

Wishing you continued success with the accelerator and its new cohort—I look forward to staying in touch.

Case: 1:25-cv-06905 Document #: 15 Filed: 08/28/25 Page 47 of 94 PageID #:209

Warm regards,
David Wishnick
Founder & CEO, Nutraberry
(425) 577-9020 | david@nutraberryinc.com

[Quoted text hidden]

# Exhibit M

Re: Follow-up

david nutraberryinc.com <david@nutraberryinc.com>
Fri 5/12/2023 7:58 PM
To: Ceballos, Amber <Amber.Ceballos@leg.wa.gov>
Cc: Xenia Dolovova <xenia@zerowastewashington.org>;Bryce Hesterman
<bhesterman@Recycle.com>;complianceandethics@oig.doc.gov <ComplianceandEthics@oig.doc.gov>

Hello Amber,

I plan to follow up with you the OIC and submit a complaint as the note from the Ethics OIC person
suggested.

That is good to know these groups are happy to speak.

I am happy to speak to either of them as well. They can set up a time to speak with me if they have
changed their mind about this situation.

There are numerous codes and bills in places that reflect my perspective that preventing food waste, to
keep edible food edible is of a higher priority than creating low value industrial uses, like straws.  For
example, HOUSE BILL 1799 goes into great detail.

I will include these in my complaint and cite where needed.

If the OIC enforces these laws, then there becomes a precedent.  Or saying it another way, these are
congressional passed and already codified laws that express a purpose that has been undermined by the
very groups that were involved in their passage.

Our business is perfectly eligible for all these competitions, but agree it far exceeds the merit of the
other teams and the disparity is obvious.  Many others have contacted me saying the same.

 These are competitions that Nutraberry has been persistently and consistently met with the same bias,
where the pattern in my opinion meets the threshold of discriminatory and is the purpose of my
complaint to the OIC.

Our proposal to each competition has been commercializing sizing our seed powders to a mean of 5
micron or the size of a single plant cell.  The finest a stone mill can mill this material is 210 microns. We
are in the development phase of taking our 210 micron and scaling material that is 43x finer (210/5 =
43) to studying the increased activity in microbiome.

This amplification of activity in the microbiome is what earned our awarded of a USDA Phase I grant to
further study and validate.  This also eliminates any settling in beverages or grit is baking, or texture
issues in other foods.

Being awarded this grant meets a higher level of competitive and merit, where I would ask the OIC to
request the cc'ed groups to explain how they ignored the value of Nutaberry's technology utilization
that improves human health while preventing edible food from going into the landfill.

In my forthcoming complaint, I plan to explain this science to illustrate fully the disparity of utility of our
product to other business that proceed to the semi and finals of numerous WA State circular

competition as egregiously being biased.

Finally, we seem to both acknowledge this is wrong since we are eligible for a completion and have built a business that has greater merit than those who were awarded 10's of thousands of dollars. I am not sure where this sense of entitlement and bias comes from. It is very disappointing.

Thank you and my next step is to submit the complaint to another department within the OIC as we already have one that has been reviewed and accepted.

Thank you for your time and attention.

David
425-577-9020

---

**From:** Ceballos, Amber <Amber.Ceballos@leg.wa.gov>
**Sent:** Tuesday, May 9, 2023 7:57 PM
**To:** david nutraberryinc.com <david@nutraberryinc.com>
**Cc:** Xenia Dolovova <xenia@zerowastewashington.org>; Bryce Hesterman <bhesterman@Recycle.com>; complianceandethics@oig.doc.gov <complianceandethics@oig.doc.gov>
**Subject:** Follow-up

Good Afternoon David,

I apologize again for taking so long to get back to you. I was able to connect with Xenia and Bryce at PreCycle and NextCycle. I asked if they were willing and able to provide more insight into how their decisions were made by providing grading criteria and a breakdown of their evaluation of your team during your participation in their selection processes. Both entities were more than happy to schedule a meeting with you to provide direct feedback and answer any questions you may have about their determination process. I think this would be a great way to get more insight to some of things you stated to us when you first wrote, such as "we have never been told what criteria we did not fit into."

As for your previous statements that "Nutraberry, upcycled edible food and is in clearly in bucket (i) and upcycled straws are (iii) in priority per RCW 70A.205.715. There is a lawful priority in activities when addressing rebuilding a material economy to being circular," I feel like this must be addressed before proceeding. The order in which items are listed in RCW 70A.205.715 does not establish an order of precedence or priority. They are only ordered and listed in a manner that makes reading the RCW easy to comprehend. A "i" listing does not precede an "iii" listing in level of priority. It is only a matter of wording which gave each category these listed lines.

Based on the emails and correspondence you have provided me, I cannot find any instances of observable hate or discrimination against Nutraberry. It appears there might be reasoning behind why your team was not selected, one of which being that you do have so much merit and that your company has been able to prove itself in this very difficult process. From the NextCycle and PreCycle websites, I have ascertained that these entities are searching for the "best product, service, or idea" that addresses the criteria in which they have posted. Specifically, in PreCycle's "about" statement, it says that their awards are looking for the best "idea-stage and development-stage startups." It is very possible that due to the high merit and level of establishment that you have been able to form with Nutraberry that you may not fit the criteria because you are more well-established than the rest of the competition pool.

As for your statement that says "When we asked about the results, we were told the judges signed NDA's and we cannot discuss this. We were told better luck next year and when next year rolled around got the same results." I think this statement would be very important to highlight for the Inspector General's office. I am happy you have reached out and established a case number with them. My next action to suggest to you, if the discussions with

Case: 1:25-cv-06905 Document #: 15 Filed: 08/28/25 Page 50 of 94 PageID #:212

the PreCycle and NextCycle representatives did not yield the results you were looking for, was going to be to file a complaint with the Office of the IG. It should be noted that a Legislator's office, such as Rep. Santos', can only assist constituents in bringing a case to the attention of the proper officials and guide the constituent through the process, but cannot direct an agency to decide a matter in their favor. The appropriate overseeing agency(ies) must make its decisions within the framework of the law and existing rules and regulations.

This means that our office can:
• request information or status reports.
• arrange for appointments or facilitate direct communication between the agency and the constituent.
•express an opinion on a matter or agency decision (subject to ex parte communication rules and the prohibition on abuse of position-- ex parte means a legal proceeding brought by one person in the absence of and without representation or notification of other parties).
• ask for reconsideration, based on law and regulation, of an administrative decision.

Outside of these parameters, our office cannot intervene. As I stated at the beginning of this message, both Bryce and Xenia state that are willing to meet with you and provide transparency as to how the competitive processes came to their conclusion. I feel it may be very beneficial for you to have a mediator present during these discussions. The Dispute Resolution Center of King County is a great resource for this. If you would like suggestions for other resources, please do not hesitate to reach out and ask.

I realize this response is likely not the one you were hoping for from our office. However, I have every confidence that the Office of the Inspector General will find any wrongdoings, if there are any to be found. In the meantime, if you feel there is more to discuss with our office, please let me know.

Thank you for your time and bringing this matter to our attention. We hope we are able to help you resolve this issue.

Very respectfully,

## Amber M. Ceballos

Legislative Assistant | House of Representatives

Office of Rep. Sharon Tomiko Santos | 37th Legislative District

321 John L. O'Brien Bldg. Olympia, WA 98504

Ring Central: 360-360-0258

housedemocrats.wa.gov| amber.ceballos@leg.wa.gov



**Equality. Fairness. Opportunity.**

NOTICE OF PUBLIC DISCLOSURE: Please note, this email and any documents you send this office may be subject to disclosure requirements under the state Public Records Act, RCW 42.56

## [WSDA Grant Notification] Spring 2024 Local Food System Infrastructure Grant

### VanHorn, Galen (AGR) <Galen.VanHorn@agr.wa.gov>

Fri 6/28/2024 7:50 PM

To:david nutraberryinc.com <david@nutraberryinc.com>
Cc:nutraberry@gmail.com <nutraberry@gmail.com>



📎 1 attachments (112 KB)

Nutraberry_Notification Letter_LFSIG.pdf;

Hello David Wishnick,

**Please find the results of your application to the Spring 2024 round of the Local Food System Infrastructure Grant in the attached notification letter.**

If you have questions, please contact localfoodinfrastructure@agr.wa.gov, and thank you for your patience as we work to process a high volume of requests.

Thank you for your time and dedication to our local food system,
Galen, Ivy, and Sarah,
The WSDA Local Food System Infrastructure Grant Team

Case: 1:25-cv-06905 Document #: 15 Filed: 08/28/25 Page 52 of 94 PageID #:214

# Use Food Well Washington Plan

The Use Food Well Washington Plan (Plan) is Washington's roadmap to reduce food waste by 50% by 2030. The information below includes details on the planning process, where to read the plan, food waste and wasted food data, and how to get involved.

## I want to...



> Read the Use Food Well Washington Plan
> Read the Use Food Well Washington Plan focus sheet
> Subscribe to the Use Food Well Washington email list

## The Use Food Well Washington Plan

5/2/24, 2:21 PM    Case: 1:25-cv-06905 Document #: 15 Filed: 08/28/25 Page 53 of 94 PageID #:215    Use Food Well Washington Plan | Washington State Department of Ecology

53



# The Use Food Well Washington Plan



# 2030 food waste reduction goals



# Three strategies to meet the 2030 goals.



# 30 recommendations to reduce food waste and wasted food

Recommendations were informed by:
**5 state agencies**

# 100+ subject matter experts
# Research
# Literature Review
# Best Practices

To address food waste and wasted food in Washington, the 2019 Washington Legislature unanimously passed the Food Waste Reduction Act, now codified as RCW 70A.205.715. ⧉

The law established statewide food waste reduction goals, relative to 2015 levels, including a focus on reducing the amount of wasted edible food. We are required to establish baseline data to annually track progress toward the statewide food waste reduction goals, along with drafting a food waste reduction plan to meet the 2030 goals.

We developed the 2015 baseline data, and further defined the edible food waste reduction goal, resulting in the following statewide food waste reduction goals:

> Reduce food waste generated by 50% by 2030
> Reduce at least half of edible food waste by 2030
> Reduce edible food waste disposed in landfills by 20% by 2025



# Washington Food Waste Reduction Goals

**1,158,746 tons** of edible and inedible food waste is generated annually in Washington

2015 Baseline Data

**By 2025, we will:**

Rescue **78,012 tons** of edible food waste for human consumption

**By 2030, we will:**

Reduce edible food waste by at least **195,032 tons** (50%)

Reduce total annual food waste by at least **579,373 tons** (50%)

We were also tasked to develop and implement a food waste reduction plan that focuses on three key strategies:

> **Prevention:** Prevent and reduce the amount of food that's wasted
> **Rescue**: Rescue edible food that would otherwise be wasted and ensure the food reaches those who need it
> **Recovery:** Support productive uses of inedible food materials, including using it for animal feed, energy production through anaerobic digestion, and for off-site or on-site management systems including composting, vermicomposting, or other biological systems

The Plan prioritizes public-private partnerships over regulations, and was developed in collaboration with the state Office of Superintendent of Public Instruction (OSPI) and Washington departments of Agriculture, Commerce, and Health, and more than 100 subject matter experts.

The Plan recommendations are a mix of federal and state policy changes, increased program funding, and investments in public education, food management systems, and recovery infrastructure. A total of 30 recommendations to reduce food waste were identified through this collaborative engagement process.

The recommendations in this plan could redirect an estimated 1.3 million tons of food waste each year from landfill disposal. A significant portion of this reduction – at least 295,000 tons per year – is estimated to be edible food diverted to hunger relief or new markets. We found additional environmental, economic, and social benefits can be realized through comprehensive implementation, including a net financial benefit of over $1 billion, annually.

Case: 1:25-cv-06905 Document #: 45 Filed: 08/28/25 Page 55 of 94 PageID #:217

To learn more about this work, see our introductory webinar ⧉, subscribe to the Use Food Well Washington email list ⧉, read the legislative report ⧉, or contact Jade Monroe at jade.monroe@ecy.wa.gov or 360-628-4031.

> ### Why is food waste reduction important?

When food is wasted, so are the resources and labor used to grow, harvest, process, transport, and manage the food from farm to table. Food waste is a huge challenge with significant environmental, social, and economic impacts.

A greater understanding of these impacts catalyzed a global effort to reduce food waste. The Food and Agricultural Organization (FAO) of the United Nations found one third (approximately 1.3 billion tons) of all food produced for human consumption is wasted ⧉. In the U.S., 35% of the 229 million tons of food available went unsold or uneaten in 2019. That's nearly $130 billion worth of meals unsold or uneaten each year, at a cost of almost 2% of the U.S. Gross Domestic Product ⧉.

Our calculations indicate **Washington generates more than one million tons of food waste annually**, with a large portion (about 35%) being edible food going into landfills. Washington is now in line with global, national, and regional goals to reduce food waste by 50% by 2030. The *Use Food Well Washington Plan* is a roadmap to meet the statewide food waste reduction goals.

> ### Food waste data

As codified in RCW 70A.205.715 ⧉, Ecology is required to identify Washington's baseline food waste data. Moving forward, we are also responsible for tracking annual metrics to measure progress toward the statewide food waste reduction goals.

A variety of data sources of data were used to determine the amount of food waste generated in a given year and whether that food waste was disposed or recovered in Washington.

The 2015 baseline data shows Washington generated approximately 1.2 million tons of food waste annually, with over 390,063 tons being edible food waste. The residential sector generated 37%, and the commercial sector generated 60% of food waste annually.

To achieve the 2030 food waste reduction goals, Washington will need to reduce food waste generated by at least 579,373 tons, with at least 195,032 tons being edible food waste.

> ### List of recommendations

## Federal policy

Strengthen the Bill Emerson Good Samaritan Food Donation Act
Support a national date labeling standard
Increase markets for lower-grade or "imperfect" produce
Improve federal tax incentives

## State policy

Create the Washington Center for Sustainable Food Management
Continue support for the Pacific Coast Food Waste Commitment
Connect the Use Food Well Washington Plan to the Food Policy Forum
Research strategies and develop partnerships to prevent food and food waste from entering landfills
Improve regulatory certainty for organics facility operations
Develop an emergency food distribution plan for Washington schools
Support 20-minute seated lunch minimum in Washington elementary schools
Support recess before lunch in Washington elementary schools
Increase access to food waste reduction education in Washington schools

## Funding

Dedicate state grant funding for statewide food waste reduction
Increase funding for local health jurisdictions
Increase funding for local government food waste reduction work
Build more farm to school partnerships

## Public education

Develop and maintain statewide food waste reduction campaigns
Develop and maintain statewide food waste contamination reduction campaign

Case: 1:25-cv-06905 Document #: 15 Filed: 08/28/25 Page 56 of 94 PageID #:218

## Infrastructure development

Increase use of food waste and wasted food data tracking

Develop and maintain maps of food and wasted food flows

Improve food donation transportation

Increase access to cold chain management

Build more community food hubs

Support value-added food processing and manufacturing

Increase infrastructure investment in schools

Expand anaerobic digestion at water resource reclemation facilities, compost facilities, and farms

Develop high-solids anaerobic digesters for mixed organic residuals

Increase use of small-scale anaerobic digesters

Diversify food waste management systems

## Contact information

**Jade Monroe**
Center lead
jade.monroe@ecy.wa.gov
360-628-4031

**Olivia Carros**
Center specialist
olivia.carros@ecy.wa.gov
360-995-3980

 An official website of the United States government

🔍

MENU

**Sustainable Management of Food**

CONTACT US <https://epa.gov/sustainable-management-food/forms/contact-us-about-sustainable-management-food>

# Wasted Food Scale

**On this page:**

- About the Wasted Food Scale
- Wasted Food Pathways
- Downloads

## About the Wasted Food Scale



The Wasted Food Scale prioritizes actions that prevent and divert wasted food from disposal. Tiers of the scale highlight different pathways for preventing or managing wasted food, arranged in order from most preferred on the top left to least preferred on the top right. Within a given tier, pathways are ranked equally.

Case: 1:25-cv-06905 Document #: 15 Filed: 08/28/25 Page 58 of 94 PageID #:220

58

The most preferred pathways – prevent wasted food, donate and upcycle food – offer the most benefits to the environment and to a circular economy. These "top" pathways prioritize using food for its intended purpose: to nourish people. The least preferred pathways – landfilling, incineration, and sending food down the drain – have the largest environmental impacts and have limited potential for circularity. Learn more about the wasted food pathways on the scale.

EPA developed the Wasted Food Scale based on the findings of its 2023 report *From Field to Bin: The Environmental Impacts of U.S. Food Waste Management Pathways* <https://epa.gov/land-research/field-bin-environmental-impacts-us-food-waste-management-pathways>. This report assesses 11 common pathways for managing wasted food in the U.S. based on their environmental impacts and potential contributions to a circular economy. The Wasted Food Scale is an update to the previous Food Recovery Hierarchy and reflects the latest science and changes in technologies and operational practices for wasted food management pathways.

Notes on the Wasted Food Scale:

- The rankings in this scale apply only to the management of wasted food by these pathways and are not applicable to other categories of municipal solid waste that may be managed by the same pathways.
- This scale does not consider economic and social factors.
- "Landfill" and "incinerate" consider impacts with and without energy recovery.
- "Send down the drain" refers to wasted food that travels via the sewer system to a water resource recovery facility with or without anaerobic digestion.
- When food is delivered by truck directly to an anaerobic digester this is considered the anaerobic digestion pathway, even if the anaerobic digester is located at a water resource recovery facility.
- The rankings for "leave unharvested" and "apply to the land" are based on limited data.

Case: 1:25-cv-06905 Document #: 15 Filed: 08/28/25 Page 59 of 94 PageID #:221



## Wasted Food Pathways

### Prevent Wasted Food

Preventing food from going to waste in the first place is the most environmentally beneficial option on the Wasted Food Scale. When food is wasted, all the resources that went into producing, processing, distributing, and preparing that food are wasted too. Learn more about preventing wasted food. <https://epa.gov/sustainable-management-food/prevent-wasted-food-through-source-reduction>

### Donate

Wholesome food that goes unsold or uneaten can be rescued, donated, or redistributed to feed people. This pathway includes food from across the food supply chain, from produce gleaned from farm fields to shelf-stable goods at a grocery store to extra meals prepared at a cafeteria. Donating food is one of the most preferred pathways because it ensures that food and the resources used to produce it are not wasted. When food is donated, it is used for its intended purpose which is to nourish people. Learn more about donating food. <https://epa.gov/sustainable-management-food/food-donation-basics>

5/2/24, 2:20 PM
Case: 1:25-cv-06905 Document #: 15 Filed: 08/28/25 Page 60 of 94 PageID #:222
Wasted Food Scale | US EPA

60

## Upcycle

Upcycling food into new food products usually takes place at the production or manufacturing stage of the food supply chain. Edible parts of food as well as less desirable scraps can be upcycled into new food products. For example, orange peels can flavor beverages, broccoli stems can be turned into slaw or be dried into powder, and spent grains from the brewing process can be turned into bread. Upcycling food is one of the most preferred pathways because it keeps food in the human food supply chain and avoids the wasting of food and the resources used to produce it.

## Feed Animals

Using wasted food as animal feed can displace the production of traditional animal feed (e.g., growing soy, corn or barley) and avoid the environmental impacts associated with the production of that feed. Turning wasted food into animal feed often requires some processing such as cooking or drying. Learn more about reducing wasted food by feeding animals. <https://epa.gov/sustainable-management-food/reduce-wasted-food-feeding-animals>

## Leave Unharvested

Food crops are ideally harvested and used to nourish people. Sometimes market forces or environmental factors cause crops to remain unharvested in the field. These factors are often beyond the control of farmers, and include commodity prices, market specifications, labor shortages, damage to crops by pests and disease, and weather events such as flooding or drought. Alternative and secondary markets can sell, process, or upcycle crops that do not meet primary market specifications. Gleaning organizations can harvest surplus crops for donation. But if crops will not be consumed even if harvested, leaving them in the field avoids the impacts of picking, processing, packaging, and distributing food that is ultimately wasted. Unharvested crops may be grazed by animals or plowed into the soil. The plant nutrients and carbon in unharvested crops enhance soil health and support the growth of future crops.

## Anaerobic Digestion with Beneficial use of Digestate/Biosolids

Anaerobic digestion is the process of breaking down organic materials, such as wasted food, in an oxygen-free environment. The anaerobic digester may be a stand-alone digester that primarily processes wasted food, an on-farm digester that co-digests food waste with manures or a digester at a water resource recovery facility that co-digests food waste with wastewater solids. In the Wasted Food Scale, if the wasted food is delivered to a digester at a water resource recovery facility via the sewer system, then that is considered the "down the drain" pathway. Anaerobic digestion generates biogas, which is a source of renewable energy. It also produces digestate or biosolids, nutrient-rich products that can be used beneficially, for example as fertilizer, soil amendment or animal bedding. When the digester is located at a water resource recovery facility, the final product is called biosolids. Digestate and biosolids can be treated in a variety of ways prior to being applied to land, for example by composting. The use of digestate and biosolids on soils can offset the need for synthetic fertilizers and enhance soil health. Learn more about anaerobic digestion. <https://epa.gov/anaerobic-digestion>

## Compost

Composting is the controlled, aerobic (oxygen-required) biological decomposition of organic materials by microorganisms. Composting wasted food with other organic materials like yard trim produces a valuable, stable soil amendment that can be used to build soil health, increase soil water retention, and reduce soil erosion. Producing and using compost recycles organic matter and nutrients that are important for long-term soil health and ecosystem resilience. Learn more about composting and using compost. <https://epa.gov/sustainable-management-food/composting>

Case: 1:25-cv-06905 Document #: 15 Filed: 08/28/25 Page 61 of 94 PageID #:223

## Anaerobic Digestion with Disposal of Digestate/Biosolids

Anaerobic digestion is the process of breaking down organic materials, such as wasted food, in an oxygen-free environment. The anaerobic digester may be a stand-alone digester that primarily processes wasted food, an on-farm digester that co-digests food waste with manures or a digester at a water resource recovery facility that co-digests food waste with wastewater solids. In the Wasted Food Scale, if the wasted food is delivered to a digester at a water resource recovery facility via the sewer system, then that is considered the "down the drain" pathway. Anaerobic digestion generates biogas, which is a source of renewable energy. It also produces digestate or biosolids, nutrient-rich products that can be used beneficially, for example as fertilizer, soil amendment or animal bedding. When the digester is located at a water resource recovery facility, the final product is called biosolids. Digestate and biosolids are sometimes disposed of in a landfill. When the digestate or biosolids is disposed of, valuable nutrients are lost. Even if renewable energy (biogas) is generated, the environmental benefits are fewer than if digestate or biosolids had been beneficially used. Learn more about anaerobic digestion. <https://epa.gov/anaerobic-digestion>

## Apply to Land

Raw wasted food from the food manufacturing and processing sector is sometimes applied to fields as a soil amendment. Land application of raw wasted food may involve spreading, spraying, or injecting the wasted food on or below the surface of the soil. The benefits and impacts of land application of food processing waste streams can vary widely based on the composition of the wasted food.

## Landfill

EPA estimates that in the U.S., 24 percent of material in municipal solid waste landfills is food. Landfilling is one of the least preferred pathways because wasted food in landfills generates methane, a powerful and short-lived greenhouse gas. Because wasted food decays relatively rapidly, most of the methane it emits avoids capture by landfill gas collection systems. Wasted food has an outsized impact on landfill methane emissions: it is responsible for 58 percent of landfill methane emissions to the atmosphere. Also, the valuable nutrients in wasted food are not recovered when landfilled. Read more about landfill methane emissions from wasted food. <https://epa.gov/land-research/quantifying-methane-emissions-landfilled-food-waste>

## Incinerate

Wasted food (when it is mixed with other municipal solid waste) may be incinerated (also referred to as combustion with energy recovery, or controlled combustion). Incineration is one of the least preferred pathways because valuable nutrients in wasted food are not recovered. Though incineration produces energy, wasted food makes for a poor feedstock because it is so wet and produces little energy compared to other municipal solid waste.

## Send Down the Drain

When wasted food is sent down the drain, it combines with other wastes in the sewer system and ends up at a water resource recovery facility, or wastewater treatment plant. Sending wasted food down the drain is one of the least preferred pathways because wasted food decays rapidly in the sewer system and generates methane, a powerful greenhouse gas. Methane emissions from sewers are released directly into the atmosphere. Energy is required to treat wastewater that contains nutrient-rich wasted food. Depending on the operations at the water resource recovery facility, the valuable nutrients in wasted food may not be recovered for beneficial use. Even if the water resource recovery facility generates energy through anaerobic digestion, the recovered energy does not offset the methane emissions from wasted food in sewers and extra energy demand for wastewater treatment.

Case: 1:25-cv-06905 Document #: 15 Filed: 08/28/25 Page 62 of 94 PageID #:224

# Downloads

Download detailed and simple versions of the Wasted Food Scale below:

- Wasted Food Scale (English) - detailed version (png) <https://epa.gov/system/files/images/2023-12/epa-wasted-food-scale-detailed.png>

- Wasted Food Scale (English) – simple version (png) <https://epa.gov/system/files/images/2024-02/epa-wasted-food-scale-simple-1.png>

- Wasted Food Scale (Arabic) – detailed version (png) <https://epa.gov/system/files/images/2024-01/epa-wasted-food-scale-detailed-ara.png>

- Wasted Food Scale (Arabic) – simple version (png) <https://epa.gov/system/files/images/2024-01/epa-wasted-food-scale-simple-ara.png>

- Wasted Food Scale (Chinese- Simplified) – detailed version (png) <https://epa.gov/system/files/images/2024-01/epa-wasted-food-scale-detailed-chs.png>

- Wasted Food Scale (Chinese- Simplified) – simple version (png) <https://epa.gov/system/files/images/2024-01/epa-wasted-food-scale-simple-chs.png>

- Wasted Food Scale (Chinese- Traditional) – detailed version (png) <https://epa.gov/system/files/images/2024-01/epa-wasted-food-scale-detailed-cht.png>

- Wasted Food Scale (Chinese- Traditional) – simple version (png) <https://epa.gov/system/files/images/2024-01/epa-wasted-food-scale-simple-cht.png>

- Wasted Food Scale (Korean) – detailed version (png) <https://epa.gov/system/files/images/2024-01/epa-wasted-food-scale-detailed-kor.png>

- Wasted Food Scale (Korean) – simple version (png) <https://epa.gov/system/files/images/2024-01/epa-wasted-food-scale-simple-kor.png>

- Wasted Food Scale (Russian) – detailed version (png) <https://epa.gov/system/files/images/2024-01/ru_epa-wasted-food-scale-detailed-rus.png>

- Wasted Food Scale (Russian) – simple version (png) <https://epa.gov/system/files/images/2024-01/ru_epa-wasted-food-scale-simple-rus.png>

- Wasted Food Scale (Spanish- Mexican) – detailed version (png) <https://epa.gov/system/files/images/2024-01/epa-wasted-food-scale-detailed-spa.png>

- Wasted Food Scale (Spanish- Mexican) – simple version  (png) <https://epa.gov/system/files/images/2024-01/epa-wasted-food-scale-simple-spa.png>

- Wasted Food Scale (Tagalog) – detailed version (png) <https://epa.gov/system/files/images/2024-01/tl_epa-wasted-food-scale-detailed-tag.png>

- Wasted Food Scale (Tagalog) – simple version (png) <https://epa.gov/system/files/images/2024-01/tl_epa-wasted-food-scale-simple-tag.png>

- Wasted Food Scale (Vietnamese) – detailed version (png) <https://epa.gov/system/files/images/2024-01/vi_epa-wasted-food-scale-detailed-vie.png>

- Wasted Food Scale (Vietnamese) – simple version (png) <https://epa.gov/system/files/images/2024-01/vi_epa-wasted-food-scale-simple-vie.png>

Sustainable Management of Food Home <https://epa.gov/sustainable-management-food>

Basics <https://epa.gov/sustainable-management-food/sustainable-management-food-basics>

Case: 1:25-cv-06905 Document #: 15 Filed: 08/28/25 Page 63 of 94 PageID #:225

**Wasted Food Scale**

Feeding Animals <https://epa.gov/sustainable-management-food/reduce-wasted-food-feeding-animals>

Prevention through Source Reduction <https://epa.gov/sustainable-management-food/prevent-wasted-food-through-source-reduction>

Donating Food <https://epa.gov/sustainable-management-food/food-donation-basics>

Composting <https://epa.gov/sustainable-management-food/composting>

Anaerobic Digestion <https://epa.gov/anaerobic-digestion>

Preventing Wasted Food at Home <https://epa.gov/recycle/preventing-wasted-food-home>

Tools for Preventing and Diverting Wasted Food <https://epa.gov/sustainable-management-food/tools-preventing-and-diverting-wasted-food>

Funding Opportunities and EPA Programs Related to the Food System <https://epa.gov/sustainable-management-food/funding-opportunities-and-epa-programs-related-food-system>

Local and Regional Resources <https://epa.gov/sustainable-management-food/regional-resources-reduce-and-divert-wasted-food-across-united-states>

Data on Wasted Food in the U.S. <https://epa.gov/facts-and-figures-about-materials-waste-and-recycling/food-material-specific-data>

Contact Us <https://epa.gov/sustainable-management-food/forms/contact-us-about-sustainable-management-food> to ask a question, provide feedback, or report a problem.

LAST UPDATED ON APRIL 25, 2024



# Discover.

**Accessibility Statement**
<https://epa.gov/accessibility/epa-accessibility-statement>

**Budget & Performance**
<https://epa.gov/planandbudget>

**Contracting**
<https://epa.gov/contracts>

**EPA www Web Snapshot**
<https://epa.gov/utilities/wwwepagov-snapshots>

**Grants** <https://epa.gov/grants>

# Connect.

**Data** <https://epa.gov/data>

**Inspector General**
<https://www.epaoig.gov/>

**Jobs** <https://epa.gov/careers>

**Newsroom**
<https://epa.gov/newsroom>

**Regulations.gov** ⧉
<https://www.regulations.gov/>

**Subscribe**
<https://epa.gov/newsroom/email-subscriptions-epa-news-releases>

**USA.gov** ⧉
<https://www.usa.gov/>

**White House** ⧉
<https://www.whitehouse.gov/>

# Ask.

**Contact EPA**
<https://epa.gov/home/forms/contact-epa>

**EPA Disclaimers**
<https://epa.gov/web-policies-and-procedures/epa-disclaimers>

**Hotlines**
<https://epa.gov/aboutepa/epa-hotlines>

**FOIA Requests**
<https://epa.gov/foia>

**Frequent Questions**
<https://epa.gov/home/frequent-questions-specific-epa-programstopics>

Case: 1:25-cv-06905 Document #: 15 Filed: 08/28/25 Page 64 of 94 PageID #:226

**No FEAR Act Data**

<https://epa.gov/ocr/whistleblower-protections-epa-and-how-they-relate-non-disclosure-agreements-signed-epa>

**Plain Writing**

<https://epa.gov/web-policies-and-procedures/plain-writing>

**Privacy**

<https://epa.gov/privacy>

**Privacy and Security Notice**

<https://epa.gov/privacy/privacy-and-security-notice>

# Follow.



Case: 1:25-cv-06905 Document #: 15 Filed: 08/28/25 Page 65 of 94 PageID #:227

65

 **Outlook**

---

### BEAM Circular Business Service and Funding: Invitation to Submit Full Proposal

| | |
|---|---|
| **From** | Gehad Elhanafy <gehad@beamcircular.org> |
| **Date** | Tue 6/17/2025 3:29 PM |
| **To** | david nutraberryinc.com <david@nutraberryinc |
| **Cc** | Neal Best <neal@beamcircular.org> |



Dear David,

Thank you for submitting the BEAM Circular Business Services and Funding Opportunities Intake Form. After reviewing your profile and meeting with our team, we are pleased to invite you to submit a full project proposal for **up to $75,000 of Direct Grants** (Grant Matching).

Please submit your full project proposal by **July 17, 2025**.

- Program solicitation
- Application link

If you need connections to partners in the North San Joaquin Valley (NSJV) to help strengthen your proposal, please let us know this week by **June 20** so we can assist.

If you have any questions or need support, please contact us or book a 15-minute office hours session with our team.

We look forward to receiving your proposal.

Best regards,
Gehad Elhanafy

--



# GEHAD ELHANAFY

*Program Associate*

📞 209-214-9997

✉ gehad@beamcircular.org

📍 1111 I St, Suite 310, Modesto, CA

🌐 beamcircular.org

# Exhibit R

## Nutraberry facilities, location, and availability of equipment and physical facilities necessary to carry out the work proposed

### *Nutraberry*

*David Wishnick and Robert Allan, Nutraberry Co-Founded,* has over ten years of experience operating this business and was instrumental in building its manufacturing process and implementing its food safety plans.

Nutraberry currently leases 3,500 sq ft of commercial food processing space in a HUB zone, at 1440 S. Jackson St. in Seattle. This facility is capable of stone milling and oil extraction, as well as temperature-sensitive material storage. Nutraberry has been in the same building for over eight years.

- Nutraberry's food safety plans can be viewed **here.**
- Nutraberry local supply chain can be viewed **here**
- 3rd Party Reports **here** and **here** after moving into this location.
- Further Company and Product information **here.**
- Additional Photos **here**.



Figure 1: Nutraberry's facilities

1. Break room. | 2. Cleaning and prep space. | 3. Freezer and refrigerator. | 4. Loading dock. | 5. Barrels of pomace/seed cake after being removed from cold storage. | 6. Room 1 with a handless handwasher, water heater, ovens, and oil press.

**Nutraberry's process to create micronized seed powder:**








| |
|---|
| 1.      Dried seed from 'seed cake' which is fed into the screw press which separates the seeds fatty acid oily fraction from the fiber. |
| Seed, like that shown in Figure 1, are fed into the screw press (top metal cylinders) and the screws crush the seed, and you can see the fatty acid oily fraction being produced simultaneously with |
| 2.      the defatted fiber fraction. Since the seed is approximately 10% oil, the defatted fraction is created at a rate of 9x the rate of the fatty acid oily fraction. |
| 3.      Accumulation of defatted seed fraction after an oil run. This material is 60% fiber and over 2% water soluble polyphenols. For context, a 1,000 lb. raspberry seed oil run will produce 9,000 lbs (about half the weight of a school bus). of this material because raspberry seed 10% oil. |
| 4.      Nutraberry stone mill that can produce no finer than 70 mesh or 210 microns. This is suitable for exfoliant application, but not for food. Even at this size it settles in beverages and has mouth feel. |
| 5.      Seed powder after stone milling the defatted fiber, Nutraberry is currently able to sifter to different sizes, but the finest a stone mill can produce is 70 mesh/ 210 microns. At scale, micronizing reduces our COGS as we do not require sifting or multiple passes for mean 5-micron defatted powders. Left to right: a. 40-60 mesh raspberry seed with oil, b. 20-40 mesh raspberry seed powder, c. defatted (RSDP) 20-40 mesh raspberry seed powder, d. defatted (RSDP) 70 mesh raspberry seed powder. |

### Americold Logistics - Lynden, WA - Refrigerated & Frozen Foods

Nutraberry's traceability begins when acquiring the seed which are shipping directly to Americold Logistics from the fruit processors. Nutraberry owns the truck in Figure 2, and receives a Bill Of Lading (BOL) from Americold. Figure 3 is an example BOL received when we pull our material. It is through AmeriCold that our lot number and traceability begin, that allows us to be certain about the source of the material we pick up, and it also allows us to produce the freshest possible material.



Figure 2: Nutraberry's Ford 450 that is used to transport 20 barrels at a time from Americold to our facility to be stone milled to 210 microns.



**Figure above:** Bill lading example. You can see the lot code and part number. Each part number is associated with a fruit processor and the lot code is the lot that the fruit processor

Nutraberry currently has SOPs in place for the manufacturing operations that are designed around the requirements of 21CFR Part 117 and their operations are performed in accordance with these SOP's.

Capacity Data based on testing Nutraberry's fruit fibers

| Material | particle size | air consumption-cubic meter per Kg | Throughput with SF300 mill | capacity Kg per 8 hr. |
|---|---|---|---|---|
| | | | | |
| Blueberry | 5 micron | 400 | 3.5 | 25 |
| | | | | |
| | 10 micron | 100 | 15 | 100 |
| | | | | |
| Raspberry | 5 micron | 400 | 3.5 | 25 |
| | | | | |
| | 10 micron | 160 | 10 | 70 |
| | | | | |
| | 5 micron | 500 | 3 | 20 |
| | | | | |
| Black Raspberry | 10 micron | 240 | 6 | 40 |

**SF 300 need about 1500 M/H = 53,000 Cubic Feet per hour**

**Only for this mill you need about 150KVA compressor**

# Analysis

**nutraberry** ®

<table>
<tr><th colspan="2">Measurement Details</th></tr>
<tr><td align="right">**Sample Name**</td><td>Bluberry seeds powder n.2</td></tr>
<tr><td align="right">**File Name**</td><td>Nutraberry</td></tr>
<tr><td align="right">**Record Number**</td><td>93</td></tr>
<tr><td align="right">**Sample Sourse**</td><td>work 10.01.22</td></tr>
</table>

<table>
<tr><th colspan="2">Measurement Details</th></tr>
<tr><td align="right">**Analysis Date Time**</td><td>10/01/2022 12:43:53</td></tr>
<tr><td align="right">**Measurement Date Time**</td><td>10/01/2022 12:43:53</td></tr>
<tr><td align="right">**Post measurement Instructions**</td><td>2000rpm, us 80%, 5 min,</td></tr>
<tr><td align="right">**Pre-measurement Instructions**</td><td>SOP-02</td></tr>
</table>

<table>
<tr><th colspan="2">Analysis</th></tr>
<tr><td align="right">**Particle Name**</td><td>Default</td></tr>
<tr><td align="right">**Particle Refractive Index**</td><td>1.520</td></tr>
<tr><td align="right">**Particle Absorption Index**</td><td>0.100</td></tr>
<tr><td align="right">**Dispersant Name**</td><td>Water</td></tr>
<tr><td align="right">**Dispersant Refractive Index**</td><td>1.330</td></tr>
<tr><td align="right">**Scattering Model**</td><td>Mie</td></tr>
<tr><td align="right">**Analysis Model**</td><td>General Purpose</td></tr>
<tr><td align="right">**Weighted Residual**</td><td>1.14 %</td></tr>
<tr><td align="right">**Laser Obscuration**</td><td>12.98 %</td></tr>
<tr><td colspan="2">**Operator name-David Wishnick**</td></tr>
</table>

<table>
<tr><th colspan="2">Result</th></tr>
<tr><td align="right">**Span**</td><td>1.794</td></tr>
<tr><td align="right">**Uniformity**</td><td>0.562</td></tr>
<tr><td align="right">**Specific Surface Area**</td><td>1489 m²/kg</td></tr>
<tr><td align="right">**D [3,2]**</td><td>4.03 µm</td></tr>
<tr><td align="right">**D [4,3]**</td><td>6.24 µm</td></tr>
<tr><td align="right">**Dv (10)**</td><td>2.13 µm</td></tr>
<tr><td align="right">**Dv (50)**</td><td>5.30 µm</td></tr>
<tr><td align="right">**Dv (90)**</td><td>11.6 µm</td></tr>
<tr><td align="right">**Dv (95)**</td><td>14.2 µm</td></tr>
<tr><td align="right">**Dv (99)**</td><td>20.0 µm</td></tr>
<tr><td align="right">**Dv (100)**</td><td>30.9 µm</td></tr>
</table>

## Frequency (compatible)



[93] Bluberry seeds powder n.2 - 10/01/2022 12:43:53

## Result

| Size (µm) | % Volume Under | Size (µm) | % Volume Under | Size (µm) | % Volume Under | Size (µm) | % Volume Under | Size (µm) | % Volume Under | Size (µm) | % Volume Under | Size (µm) | % Volume Under | Size (µm) | % Volume Under |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0.0100 | 0.00 | 0.0597 | 0.00 | 0.357 | 0.00 | 2.13 | 10.04 | 12.7 | 92.66 | 76.0 | 100.00 | 454 | 100.00 | 2710 | 100.00 |
| 0.0114 | 0.00 | 0.0679 | 0.00 | 0.405 | 0.00 | 2.42 | 13.32 | 14.5 | 95.44 | 86.4 | 100.00 | 516 | 100.00 | 3080 | 100.00 |
| 0.0129 | 0.00 | 0.0771 | 0.00 | 0.460 | 0.00 | 2.75 | 17.40 | 16.4 | 97.37 | 98.1 | 100.00 | 586 | 100.00 | 3500 | 100.00 |
| 0.0147 | 0.00 | 0.0876 | 0.00 | 0.523 | 0.00 | 3.12 | 22.30 | 18.7 | 98.61 | 111 | 100.00 | 666 | 100.00 | | |
| 0.0167 | 0.00 | 0.0995 | 0.00 | 0.594 | 0.00 | 3.55 | 27.99 | 21.2 | 99.34 | 127 | 100.00 | 756 | 100.00 | | |
| 0.0189 | 0.00 | 0.113 | 0.00 | 0.675 | 0.00 | 4.03 | 34.42 | 24.1 | 99.73 | 144 | 100.00 | 859 | 100.00 | | |
| 0.0215 | 0.00 | 0.128 | 0.00 | 0.767 | 0.24 | 4.58 | 41.47 | 27.4 | 99.92 | 163 | 100.00 | 976 | 100.00 | | |
| 0.0244 | 0.00 | 0.146 | 0.00 | 0.872 | 0.72 | 5.21 | 48.98 | 31.1 | 100.00 | 186 | 100.00 | 1110 | 100.00 | | |
| 0.0278 | 0.00 | 0.166 | 0.00 | 0.991 | 1.40 | 5.92 | 56.70 | 35.3 | 100.00 | 211 | 100.00 | 1260 | 100.00 | | |
| 0.0315 | 0.00 | 0.188 | 0.00 | 1.13 | 2.20 | 6.72 | 64.35 | 40.1 | 100.00 | 240 | 100.00 | 1430 | 100.00 | | |
| 0.0358 | 0.00 | 0.214 | 0.00 | 1.28 | 3.11 | 7.64 | 71.64 | 45.6 | 100.00 | 272 | 100.00 | 1630 | 100.00 | | |
| 0.0407 | 0.00 | 0.243 | 0.00 | 1.45 | 4.20 | 8.68 | 78.29 | 51.8 | 100.00 | 310 | 100.00 | 1850 | 100.00 | | |
| 0.0463 | 0.00 | 0.276 | 0.00 | 1.65 | 5.61 | 9.86 | 84.09 | 58.9 | 100.00 | 352 | 100.00 | 2100 | 100.00 | | |
| 0.0526 | 0.00 | 0.314 | 0.00 | 1.88 | 7.51 | 11.2 | 88.89 | 66.9 | 100.00 | 400 | 100.00 | 2390 | 100.00 | | |

# Analysis

nutraberry™

72

## Measurement Details

| | |
|---|---|
| **Sample Name** | Raspberry seed powder n.1 |
| **File Name** | Nutraberry |
| **Record Number** | 157 |
| **Sample Sourse** | work 16.01.22 |

## Measurement Details

| | |
|---|---|
| **Analysis Date Time** | 16/01/2022 11:06:05 |
| **Measurement Date Time** | 16/01/2022 11:06:05 |
| **Post measurement Instructions** | 2000 rpm ,us18, 0-5 min |
| **Pre-measurement Instructions** | SOP-02 |

## Analysis

| | |
|---|---|
| **Particle Name** | Default |
| **Particle Refractive Index** | 1.520 |
| **Particle Absorption Index** | 0.100 |
| **Dispersant Name** | Water |
| **Dispersant Refractive Index** | 1.330 |
| **Scattering Model** | Mie |
| **Analysis Model** | General Purpose |
| **Weighted Residual** | 1.60 % |
| **Laser Obscuration** | 16.90 % |
| **Operator name-Leonid Zisman** | |

## Result

| | |
|---|---|
| **Span** | 2.258 |
| **Uniformity** | 1.119 |
| **Specific Surface Area** | 1913 m²/kg |
| **D [3,2]** | 3.14 µm |
| **D [4,3]** | 7.26 µm |
| **Dv (10)** | 1.53 µm |
| **Dv (50)** | 4.22 µm |
| **Dv (90)** | 11.1 µm |
| **Dv (95)** | 17.8 µm |
| **Dv (99)** | 78.4 µm |
| **Dv (100)** | 126 µm |

## Frequency (compatible)



[157] Raspberry seed powder n.1-16/01/2022 11:06:05

## Result

| Size (µm) | % Volume Under | Size (µm) | % Volume Under | Size (µm) | % Volume Under | Size (µm) | % Volume Under | Size (µm) | % Volume Under | Size (µm) | % Volume Under | Size (µm) | % Volume Under | Size (µm) | % Volume Under |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0.0100 | 0.00 | 0.0597 | 0.00 | 0.357 | 0.00 | 2.13 | 17.64 | 12.7 | 92.24 | 76.0 | 98.89 | 454 | 100.00 | 2710 | 100.00 |
| 0.0114 | 0.00 | 0.0679 | 0.00 | 0.405 | 0.00 | 2.42 | 22.15 | 14.5 | 93.63 | 86.4 | 99.33 | 516 | 100.00 | 3080 | 100.00 |
| 0.0129 | 0.00 | 0.0771 | 0.00 | 0.460 | 0.00 | 2.75 | 27.53 | 16.4 | 94.59 | 98.1 | 99.66 | 586 | 100.00 | 3500 | 100.00 |
| 0.0147 | 0.00 | 0.0876 | 0.00 | 0.523 | 0.00 | 3.12 | 33.67 | 18.7 | 95.25 | 111 | 99.88 | 666 | 100.00 | | |
| 0.0167 | 0.00 | 0.0995 | 0.00 | 0.594 | 0.07 | 3.55 | 40.36 | 21.2 | 95.70 | 127 | 100.00 | 756 | 100.00 | | |
| 0.0189 | 0.00 | 0.113 | 0.00 | 0.675 | 0.50 | 4.03 | 47.42 | 24.1 | 96.01 | 144 | 100.00 | 859 | 100.00 | | |
| 0.0215 | 0.00 | 0.128 | 0.00 | 0.767 | 1.42 | 4.58 | 54.59 | 27.4 | 96.22 | 163 | 100.00 | 976 | 100.00 | | |
| 0.0244 | 0.00 | 0.146 | 0.00 | 0.872 | 2.76 | 5.21 | 61.63 | 31.1 | 96.38 | 186 | 100.00 | 1110 | 100.00 | | |
| 0.0278 | 0.00 | 0.166 | 0.00 | 0.991 | 4.31 | 5.92 | 68.29 | 35.3 | 96.54 | 211 | 100.00 | 1260 | 100.00 | | |
| 0.0315 | 0.00 | 0.188 | 0.00 | 1.13 | 5.89 | 6.72 | 74.34 | 40.1 | 96.74 | 240 | 100.00 | 1430 | 100.00 | | |
| 0.0358 | 0.00 | 0.214 | 0.00 | 1.28 | 7.47 | 7.64 | 79.62 | 45.6 | 97.03 | 272 | 100.00 | 1630 | 100.00 | | |
| 0.0407 | 0.00 | 0.243 | 0.00 | 1.45 | 9.19 | 8.68 | 84.04 | 51.8 | 97.42 | 310 | 100.00 | 1850 | 100.00 | | |
| 0.0463 | 0.00 | 0.276 | 0.00 | 1.65 | 11.29 | 9.86 | 87.57 | 58.9 | 97.89 | 352 | 100.00 | 2100 | 100.00 | | |
| 0.0526 | 0.00 | 0.314 | 0.00 | 1.88 | 14.05 | 11.2 | 90.26 | 66.9 | 98.40 | 400 | 100.00 | 2390 | 100.00 | | |

Malvern Panalytical

altica

l.com

C:\Measurement Data\Measurement Data\Nutraberry.mmes

**nutraberry**™

**Technical Data Sheet**

Nutraberry Defatted Blackberry Seed Powder sized to Dv (50) 5 micron

Product Code:  BBSPD

**Nutraberry Blackberry Seed Powder** is a non-extracted product of blackberries (*Rubus fruticosus* L where the seeds Fatty Acids have been cold pressed. The remaining seed is then referred to as "defatted".  The starting material "seed cake" of the crushed fruit is used intact with the only processing of cold pressing the seed, extracting the seeds Fatty Acids and other components of seed's fatty-soluble fraction.  The starting material is ≈30% flesh before drying.  The result is a spectrum of naturally occurring compounds and ratios thereof derived from blackberries inclusive of dietary fiber and the key component ellagitannins.  Science identifies these compounds as antioxidants with a host of beneficial effects.  The source of these compounds is from fruit grown and harvested in the state of Oregon where it is harvested only once per year.  The processing of the "seed cake" is minimal, only drying, cold pressing, and then grinding to provide the benefits of blackberry seeds and their antioxidant constituent ellagitannins.

TYPICAL CHARACTERISTICS

| | |
|---|---|
| Description | Powder form of blackberry seeds |
| Latin Binomial | *Rubus fruticosus* L. |
| Country of Origin | Grown and processed in the United States |
| Particle Size | 95% through 5 micron screen |
| Appearance | Dark brown to black, fine powder |

| SPECIFICATIONS | LIMITS | METHODS |
|---|---|---|
| Botanical Identity | Conforms | HPTLC |
| Dietary Fiber | NLT 60% | AOAC |
| Water Activity | NMT 0.5 | CMMEF |
| | | |
| Heavy Metals | | |
| Lead | LT 1.5 ppm | ICP-MS |
| Arsenic | LT 2.0 ppm | ICP-MS |
| Cadmium | LT 0.5 ppm | ICP-MS |
| Mercury | LT 0.5 ppm | ICP-MS |
| | | |
| Microbiology | | |
| Total Aerobic Plate Count | NMT 100 cfu/g | FDA-BAM |
| Yeast and Mold | NMT 100 cfu/g | FDA-BAM |
| Coliforms | Negative | FDA-BAM |
| *E. coli* | Negative | FDA-BAM |
| Salmonella | Negative | FDA-BAM |
| *Staph. Aureus* | Negative | FDA-BAM |

TDS-BBSPD-01/Rev. 03/April 2014



**Technical Data Sheet**

Nutraberry  Defatted  Raspberry Seed Powder sized to Dv (50) 5 microns.

Product Code: RSPD

**Nutraberry Defatted Raspberry Seed Powder** is a product of raspberry seeds (Rubus Idaeus L.) that has had the fatty acids removed by cold-press extraction. The remaining seed product is then referred to as "defatted". The starting material "seed cake" of the crushed fruit is used intact with the only processing of cold pressing the seed, extracting the seeds Fatty Acids and a fraction of the naturally occurring Vitamin E. The starting material is ≈30% flesh before drying. The result is a full spectrum of naturally occurring compounds and ratios thereof derived from unaltered raspberries inclusive of dietary fiber and the key component ellagitannins. Science identifies these compounds as antioxidants with a host of beneficial effects. The source of these compounds is from fruit grown and harvested in the state of Washington where it is harvested only once per year. The processing of the "seed cake" is minimal, with only drying, cold-pressing, and grinding occurring to provide the benefits of the raspberry and the constituent antioxidant ellagitannins.

## TYPICAL CHARACTERISTICS

| | |
|---|---|
| Description | Powder form of raspberry seed |
| Latin Binomial | *Rubus Idaeus L.* |
| Country of Origin | Grown and processed in the United States in the state of Washington |
| Particle Size | Mean (50%) by volume below 5 Micron |
| Appearance | Characteristic of raspberry seed, fine powder |

| SPECIFICATIONS | LIMITS | METHODS |
|---|---|---|
| Botanical Identity | Conforms | HPTLC |
| Dietary Fiber | NLT 60% | AOAC |
| Moisture | LT 6% | Loss on Drying |
| | | |
| Heavy Metals | | |
| Lead | LT 1.5 ppm | ICP-MS |
| Arsenic | LT 2.0 ppm | ICP-MS |
| Cadmium | LT 0.5 ppm | ICP-MS |
| Mercury | LT 0.5 ppm | ICP-MS |
| | | |
| Microbiology | | |
| Total Aerobic Plate Count | NMT 100 cfu/g | FDA-BAM |
| Yeast and Mold | NMT 100 cfu/g | FDA-BAM |
| Coliforms | Negative (LT 5 cfu) | FDA-BAM |
| *E. coli* | Negative (LT 5 cfu) | FDA-BAM |
| Salmonella | Negative | FDA-BAM |
| *Staph. Aureus* | Negative (LT 5 cfu) | FDA-BAM |

TDS-RSPD/Rev. 02/August 2017

# nutraberry™

## Typical Analytical  Details  - Polyphenols [1]

| Nutrient: | Ellagic Acid | Ellagitannins | Proanthocyanidins | Total Polyphenols |
|---|---|---|---|---|
| Content: | 50 mg/100 g | 1760 mg/100 g | 370 mg/100 g | 2150 mg/100 g |

1.      Kosmala, M., et al., Chemical composition of defatted strawberry and raspberry seeds and the effect of these dietary ingredients on polyphenol metabolites, intestinal function, and selected serum parameters in rats. J Agric Food Chem, 2015. 63(11): p. 2989-96.



# SIDI<sup>TM</sup> Botanical Ingredient Information

| | | | |
|---|---|---|---|
| PRODUCT PRODUCER: | Nutraberry, LLC<br>PO Box 82633<br>Kenmore, WA 98028-0633 | PHONE: | (425) 577-9020 |
| | | FAX: | N/A |
| WAREHOUSE ADDRESS: | 1440 S Jackson St Seattle, WA 98144 | TYPE OF BUSINESS: | Makers and marketers of berry products |
| ACTIVITIES AT WAREHOUSE SITE | Warehousing, sales & distribution | SUPPLY CHAIN SUMMARY | NUB ➔ Customer |

## Section 1.  PRODUCT INFORMATION

| | |
|---|---|
| PRODUCT TRADE NAME: | Raspberry Seed Powder |
| PRODUCER'S PRODUCT/ITEM CODE: | RRSP-04 |
| COMMON OR USUAL NAME: | Raspberry seed powder |
| SCOPE OF DOCUMENT: | Confidential (details for Customer regulatory, quality and technical references only. |
| GENERAL PRODUCT INFORMATION: | Dried raspberry seed powder, no extraction. |

## Section 2.  GENERAL MANUFACTURING INFORMATION

| | |
|---|---|
| PRODUCER: | Nutraberry, LLC |
| ADDRESS OF MANUFACTURER: | 1440 S Jackson St Seattle, WA 98144 |
| AGRICULTURAL PROCESS: | Standard agricultural practices. Allowable chemicals within the state of Washington. |
| MANUFACTURING PROCESS: | Whole seed "cake" from raspberries (30% flesh), dried and ground to US 70 mesh |
| GMP COMPLIANCE: | United States Code of Federal Regulations Title 21 Part 110 |
| METHODS OF CULTIVATION: | Open grown and harvested. Growers in full compliance with Washington State Department of Agriculture practices and regulations. Grown exclusively in the state of Washington, USA. |
| KNOWN OR POTENTIAL IMPURITIES (INCLUDING SOLVENTS): | No solvents used in manufacturing. See Spec Sheet for standards for contaminants. |

## Section 3.  PHYSICAL/CHEMICAL INFORMATION

| | |
|---|---|
| COMMON OR USUAL NAME (PER CURRENT HERBS OF COMMERCE): | Raspberry |
| LATIN BINOMIAL: | *Rubus idaeus L.* |
| % BY WEIGHT: | 100% |
| PURPOSE IN PRODUCT: | Botanical ingredient |
| IN HERBS OF COMMERCE: | Yes pp. 127, 175 |
| PLANT PART: | Seeds and Fruit |
| EXTRACT RATIO: | No extraction |
| ACTIVE MARKER: | Ellagic acid and ellagitannins |
| ORIGIN: | US (Washington State) |
| CAS REGISTRY NO.: | N/A |
| OTHER INGREDIENTS: | None |
| CURRENT SPECIFICATIONS: | Attached as TDS-RSP-04 |
| ASSAY METHOD: | HPLC method for phenolics – available upon request. |
| RECOMMENDED IDENTIFICATION MODE: | Standard sample initial library fingerprint for FT-IR comparative or HPTLC evaluation of material. |
| STERILIZATION OR FUMIGATION: | N/A |
| SOLVENTS & RESIDUE: | None |



# Exhibit S

**Purchase Order**
**PO-3872**

PO Date: 01/03/2024      Receive By: **01/17/2024**

| Bill to: | Ship to: | TOTAL |
|---|---|---|
| **Salt & Straw, LLC** | 2501-CKOR | |
| 110 SE 2nd Ave | 110 SE 2nd Avenue | **$924.00** |
| Portland, OR 97214 | Portland OR 97214 | |
| | United States | |

| Vendor # | Terms | Shipping Method |
|---|---|---|
| VE-2196 Nutraberry, LLC | | |

| Quantity | UOM | Item | Item # | Rate | Amount |
|---|---|---|---|---|---|
| 6 | 22CS | **Nutraberry Defatted Raspberry Seed Powder**<br>RSPD | N170166 | $154.00 | $924.00 |

| | | |
|---|---|---|
| | **Total** | $924.00 |

Please send all invoices to: saltandstrawingredients@invoice.plateiq.com

1of 1




THIS INSTRUMENT AND ANY SECURITIES ISSUABLE PURSUANT HERETO HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), OR UNDER THE SECURITIES LAWS OF CERTAIN STATES. THESE SECURITIES MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED EXCEPT AS PERMITTED IN THIS SAFE AND UNDER THE ACT AND APPLICABLE STATE SECURITIES LAWS PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT OR AN EXEMPTION THEREFROM.

## NUTRABERRY INC.
## SAFE
### (Simple Agreement for Future Equity)

THIS CERTIFIES THAT in exchange for the payment by Loyal VC LP (the "Investor") of $10,000.00 (the "Purchase Amount") on or about June 3, 2025, Nutraberry Inc., a Delaware corporation (the "Company"), issues to the Investor the right to certain shares of the Company's Capital Stock, subject to the terms described below.

The "**Post-Money Valuation Cap**" is $5,000,000.00. See **Section 2** for certain additional defined terms.

1.  *Events*

(a) **Equity Financing**. If there is an Equity Financing before the termination of this Safe, on the initial closing of such Equity Financing, this Safe will automatically convert into the greater of: (1) the number of shares of Standard Preferred Stock equal to the Purchase Amount divided by the lowest price per share of the Standard Preferred Stock; or (2) the number of shares of Safe Preferred Stock equal to the Purchase Amount divided by the Safe Price.

In connection with the automatic conversion of this Safe into shares of Standard Preferred Stock or Safe Preferred Stock, the Investor will execute and deliver to the Company all of the transaction documents related to the Equity Financing; *provided,* that such documents (i) are the same documents to be entered into with the purchasers of Standard Preferred Stock, with appropriate variations for the Safe Preferred Stock if applicable, and (ii) have customary exceptions to any drag-along applicable to the Investor, including (without limitation) limited representations, warranties, liability and indemnification obligations for the Investor.

(b) **Liquidity Event**. If there is a Liquidity Event before the termination of this Safe, the Investor will automatically be entitled (subject to the liquidation priority set forth in Section 1(d) below) to receive a portion of Proceeds, due and payable to the Investor immediately prior to, or concurrent with, the consummation of such Liquidity Event, equal to the greater of (i) the Purchase Amount (the "**Cash-Out Amount**") or (ii) the amount payable on the number of shares of Common Stock equal to the Purchase Amount divided by the Liquidity Price (the "**Conversion Amount**"). If any of the Company's securityholders are given a choice as to the form and amount of Proceeds to be received in a Liquidity Event, the Investor will be given the same choice, *provided* that the Investor may not choose to receive a form of consideration that the Investor would be ineligible to receive as a result of the Investor's failure to satisfy any requirement or limitation generally applicable to the Company's securityholders, or under any applicable laws.

Notwithstanding the foregoing, in connection with a Change of Control intended to qualify as a tax-free reorganization, the Company may reduce the cash portion of Proceeds payable to the Investor by the amount determined by its board of directors in good faith for such Change of Control to qualify as a tax-free reorganization for U.S. federal income tax purposes, provided that such reduction (A) does not reduce the total Proceeds payable to such Investor and (B) is applied in the same manner and on a pro rata basis to all securityholders who have equal priority to the Investor under Section 1(d).

(c) **Dissolution Event**. If there is a Dissolution Event before the termination of this Safe, the Investor will automatically be entitled (subject to the liquidation priority set forth in Section 1(d) below) to receive a portion of Proceeds equal to the Cash-Out Amount, due and payable to the Investor immediately prior to the consummation of the Dissolution Event.

(d) **Liquidation Priority**. In a Liquidity Event or Dissolution Event, this Safe is intended to operate like standard non-participating Preferred Stock. The Investor's right to receive its Cash-Out Amount is:

© 2023 Y Combinator Management, LLC. This form is made available under a Creative Commons Attribution-NoDerivatives 4.0 License (International): https://creativecommons.org/licenses/by-nd/4.0/legalcode. You may modify this form so you can use it in transactions, but please do not publicly disseminate a modified version of the form without asking us first.

Document Ref: JRBK8-UKHBY-TYQXI-Y5GJD

(i)    Junior to payment of outstanding indebtedness and creditor claims, including contractual claims for payment and convertible promissory notes (to the extent such convertible promissory notes are not actually or notionally converted into Capital Stock);

(ii)    On par with payments for other Safes and/or Preferred Stock, and if the applicable Proceeds are insufficient to permit full payments to the Investor and such other Safes and/or Preferred Stock, the applicable Proceeds will be distributed pro rata to the Investor and such other Safes and/or Preferred Stock in proportion to the full payments that would otherwise be due; and

(iii)    Senior to payments for Common Stock.

The Investor's right to receive its Conversion Amount is (A) on par with payments for Common Stock and other Safes and/or Preferred Stock who are also receiving Conversion Amounts or Proceeds on a similar as-converted to Common Stock basis, and (B) junior to payments described in clauses (i) and (ii) above (in the latter case, to the extent such payments are Cash-Out Amounts or similar liquidation preferences).

(e)  **Termination**.  This Safe will automatically terminate (without relieving the Company of any obligations arising from a prior breach of or non-compliance with this Safe) immediately following the earliest to occur of: (i) the issuance of Capital Stock to the Investor pursuant to the automatic conversion of this Safe under Section 1(a); or (ii) the payment, or setting aside for payment, of amounts due the Investor pursuant to Section 1(b) or Section 1(c).

2.  *Definitions*

"**Capital Stock**" means the capital stock of the Company, including, without limitation, the "**Common Stock**" and the "**Preferred Stock**."

"**Change of Control**" means (i) a transaction or series of related transactions in which any "person" or "group" (within the meaning of Section 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended), becomes the "beneficial owner" (as defined in Rule 13d-3 under the Securities Exchange Act of 1934, as amended), directly or indirectly, of more than 50% of the outstanding voting securities of the Company having the right to vote for the election of members of the Company's board of directors, (ii) any reorganization, merger or consolidation of the Company, other than a transaction or series of related transactions in which the holders of the voting securities of the Company outstanding immediately prior to such transaction or series of related transactions retain, immediately after such transaction or series of related transactions, at least a majority of the total voting power represented by the outstanding voting securities of the Company or such other surviving or resulting entity or (iii) a sale, lease or other disposition of all or substantially all of the assets of the Company.

"**Company Capitalization**" is calculated as of immediately prior to the Equity Financing and (without double-counting, in each case calculated on an as-converted to Common Stock basis):

- Includes all shares of Capital Stock issued and outstanding;
- Includes all Converting Securities;
- Includes all (i) issued and outstanding Options and (ii) Promised Options; and
- Includes the Unissued Option Pool, except that any increase to the Unissued Option Pool in connection with the Equity Financing will only be included to the extent that the number of Promised Options exceeds the Unissued Option Pool prior to such increase.

"**Converting Securities**" includes this Safe and other convertible securities issued by the Company, including but not limited to: (i) other Safes; (ii) convertible promissory notes and other convertible debt instruments; and (iii) convertible securities that have the right to convert into shares of Capital Stock.

"**Direct Listing**" means the Company's initial listing of its Common Stock (other than shares of Common Stock not eligible for resale under Rule 144 under the Securities Act) on a national securities exchange by means of an effective registration statement on Form S-1 filed by the Company with the SEC that registers shares of existing capital stock of the Company for resale, as approved by the Company's board of directors. For the avoidance of doubt, a Direct Listing will not be deemed to be an underwritten offering and will not involve any underwriting services.

-2-

Document Ref: JRBK8-UKHBY-TYQXI-Y5GJD

**POST-MONEY VALUATION CAP**

"**Dissolution Event**" means (i) a voluntary termination of operations, (ii) a general assignment for the benefit of the Company's creditors or (iii) any other liquidation, dissolution or winding up of the Company (**excluding** a Liquidity Event), whether voluntary or involuntary.

"**Dividend Amount**" means, with respect to any date on which the Company pays a dividend on its outstanding Common Stock, the amount of such dividend that is paid per share of Common Stock multiplied by (x) the Purchase Amount divided by (y) the Liquidity Price (treating the dividend date as a Liquidity Event solely for purposes of calculating such Liquidity Price).

"**Equity Financing**" means a bona fide transaction or series of transactions with the principal purpose of raising capital, pursuant to which the Company issues and sells Preferred Stock at a fixed valuation, including but not limited to, a pre-money or post-money valuation.

"**Initial Public Offering**" means the closing of the Company's first firm commitment underwritten initial public offering of Common Stock pursuant to a registration statement filed under the Securities Act.

"**Liquidity Capitalization**" is calculated as of immediately prior to the Liquidity Event, and (without double-counting, in each case calculated on an as-converted to Common Stock basis):

- Includes all shares of Capital Stock issued and outstanding;
- Includes all (i) issued and outstanding Options and (ii) to the extent receiving Proceeds, Promised Options;
- Includes all Converting Securities, **other than** any Safes and other convertible securities (including without limitation shares of Preferred Stock) where the holders of such securities are receiving Cash-Out Amounts or similar liquidation preference payments in lieu of Conversion Amounts or similar "as-converted" payments; and
- Excludes the Unissued Option Pool.

"**Liquidity Event**" means a Change of Control, a Direct Listing or an Initial Public Offering.

"**Liquidity Price**" means the price per share equal to the Post-Money Valuation Cap divided by the Liquidity Capitalization.

"**Options**" includes options, restricted stock awards or purchases, RSUs, SARs, warrants or similar securities, vested or unvested.

"**Proceeds**" means cash and other assets (including without limitation stock consideration) that are proceeds from the Liquidity Event or the Dissolution Event, as applicable, and legally available for distribution.

"**Promised Options**" means promised but ungranted Options that are the greater of those (i) promised pursuant to agreements or understandings made prior to the execution of, or in connection with, the term sheet or letter of intent for the Equity Financing or Liquidity Event, as applicable (or the initial closing of the Equity Financing or consummation of the Liquidity Event, if there is no term sheet or letter of intent), (ii) in the case of an Equity Financing, treated as outstanding Options in the calculation of the Standard Preferred Stock's price per share, or (iii) in the case of a Liquidity Event, treated as outstanding Options in the calculation of the distribution of the Proceeds.

"**Safe**" means an instrument containing a future right to shares of Capital Stock, similar in form and content to this instrument, purchased by investors for the purpose of funding the Company's business operations. References to "this Safe" mean this specific instrument.

"**Safe Preferred Stock**" means the shares of the series of Preferred Stock issued to the Investor in an Equity Financing, having the identical rights, privileges, preferences, seniority, liquidation multiple and restrictions as the shares of Standard Preferred Stock, except that any price-based preferences (such as the per share liquidation amount, initial conversion price and per share dividend amount) will be based on the Safe Price.

Document Ref: JRBK8-UKHBY-TYQXI-Y5GJD

**POST-MONEY VALUATION CAP**

"**Safe Price**" means the price per share equal to the Post-Money Valuation Cap divided by the Company Capitalization.

"**Standard Preferred Stock**" means the shares of the series of Preferred Stock issued to the investors investing new money in the Company in connection with the initial closing of the Equity Financing.

"**Unissued Option Pool**" means all shares of Capital Stock that are reserved, available for future grant and not subject to any outstanding Options or Promised Options (but in the case of a Liquidity Event, only to the extent Proceeds are payable on such Promised Options) under any equity incentive or similar Company plan.

### 3. *Company Representations*

(a)  The Company is a corporation duly organized, validly existing and in good standing under the laws of its state of incorporation, and has the power and authority to own, lease and operate its properties and carry on its business as now conducted.

(b)  The execution, delivery and performance by the Company of this Safe is within the power of the Company and has been duly authorized by all necessary actions on the part of the Company (subject to section 3(d)). This Safe constitutes a legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity.  To its knowledge, the Company is not in violation of (i) its current certificate of incorporation or bylaws, (ii) any material statute, rule or regulation applicable to the Company or (iii) any material debt or contract to which the Company is a party or by which it is bound, where, in each case, such violation or default, individually, or together with all such violations or defaults, could reasonably be expected to have a material adverse effect on the Company.

(c)  The performance and consummation of the transactions contemplated by this Safe do not and will not: (i) violate any material judgment, statute, rule or regulation applicable to the Company; (ii) result in the acceleration of any material debt or contract to which the Company is a party or by which it is bound; or (iii) result in the creation or imposition of any lien on any property, asset or revenue of the Company or the suspension, forfeiture, or nonrenewal of any material permit, license or authorization applicable to the Company, its business or operations.

(d)  No consents or approvals are required in connection with the performance of this Safe, other than: (i) the Company's corporate approvals; (ii) any qualifications or filings under applicable securities laws; and (iii) necessary corporate approvals for the authorization of Capital Stock issuable pursuant to Section 1.

(e)  To its knowledge, the Company owns or possesses (or can obtain on commercially reasonable terms) sufficient legal rights to all patents, trademarks, service marks, trade names, copyrights, trade secrets, licenses, information, processes and other intellectual property rights necessary for its business as now conducted and as currently proposed to be conducted, without any conflict with, or infringement of the rights of, others.

### 4. *Investor Representations*

(a)  The Investor has full legal capacity, power and authority to execute and deliver this Safe and to perform its obligations hereunder. This Safe constitutes a valid and binding obligation of the Investor, enforceable in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity.

(b) The Investor is an accredited investor as such term is defined in Rule 501 of Regulation D under the Securities Act, and acknowledges and agrees that if not an accredited investor at the time of an Equity Financing, the Company may void this Safe and return the Purchase Amount. The Investor has been advised that this Safe and the underlying securities have not been registered under the Securities Act, or any state securities laws and, therefore, cannot be resold unless they are registered under the Securities Act and applicable state securities laws or unless an exemption from such registration requirements is available. The Investor is purchasing this Safe and the securities to be acquired by the Investor hereunder for its own account for investment, not as a nominee or agent, and not with a view to, or for resale in

-4-

Document Ref: JRBK8-UKHBY-TYQXI-Y5GJD

connection with, the distribution thereof, and the Investor has no present intention of selling, granting any participation in, or otherwise distributing the same. The Investor has such knowledge and experience in financial and business matters that the Investor is capable of evaluating the merits and risks of such investment, is able to incur a complete loss of such investment without impairing the Investor's financial condition and is able to bear the economic risk of such investment for an indefinite period of time.

**5.** *Miscellaneous*

(a) Any provision of this Safe may be amended, waived or modified by written consent of the Company and either (i) the Investor or (ii) the majority-in-interest of all then-outstanding Safes with the same "Post-Money Valuation Cap" and "Discount Rate" as this Safe (and Safes lacking one or both of such terms will be considered to be the same with respect to such term(s)), *provided that* with respect to clause (ii): (A) the Purchase Amount may not be amended, waived or modified in this manner, (B) the consent of the Investor and each holder of such Safes must be solicited (even if not obtained), and (C) such amendment, waiver or modification treats all such holders in the same manner. "Majority-in-interest" refers to the holders of the applicable group of Safes whose Safes have a total Purchase Amount greater than 50% of the total Purchase Amount of all of such applicable group of Safes.

(b) Any notice required or permitted by this Safe will be deemed sufficient when delivered personally or by overnight courier or sent by email to the relevant address listed on the signature page, or 48 hours after being deposited in the U.S. mail as certified or registered mail with postage prepaid, addressed to the party to be notified at such party's address listed on the signature page, as subsequently modified by written notice.

(c) The Investor is not entitled, as a holder of this Safe, to vote or be deemed a holder of Capital Stock for any purpose other than tax purposes, nor will anything in this Safe be construed to confer on the Investor, as such, any rights of a Company stockholder or rights to vote for the election of directors or on any matter submitted to Company stockholders, or to give or withhold consent to any corporate action or to receive notice of meetings, until shares have been issued on the terms described in Section 1. However, if the Company pays a dividend on outstanding shares of Common Stock (that is not payable in shares of Common Stock) while this Safe is outstanding, the Company will pay the Dividend Amount to the Investor at the same time.

(d) Neither this Safe nor the rights in this Safe are transferable or assignable, by operation of law or otherwise, by either party without the prior written consent of the other; *provided, however*, that this Safe and/or its rights may be assigned without the Company's consent by the Investor (i) to the Investor's estate, heirs, executors, administrators, guardians and/or successors in the event of Investor's death or disability, or (ii) to any other entity who directly or indirectly, controls, is controlled by or is under common control with the Investor, including, without limitation, any general partner, managing member, officer or director of the Investor, or any venture capital fund now or hereafter existing which is controlled by one or more general partners or managing members of, or shares the same management company with, the Investor.

(e) In the event any one or more of the provisions of this Safe is for any reason held to be invalid, illegal or unenforceable, in whole or in part or in any respect, or in the event that any one or more of the provisions of this Safe operate or would prospectively operate to invalidate this Safe, then and in any such event, such provision(s) only will be deemed null and void and will not affect any other provision of this Safe and the remaining provisions of this Safe will remain operative and in full force and effect and will not be affected, prejudiced, or disturbed thereby.

(f) All rights and obligations hereunder will be governed by the laws of the State of Delaware, without regard to the conflicts of law provisions of such jurisdiction.

(g) The parties acknowledge and agree that for United States federal and state income tax purposes this Safe is, and at all times has been, intended to be characterized as stock, and more particularly as common stock for purposes of Sections 304, 305, 306, 354, 368, 1036 and 1202 of the Internal Revenue Code of 1986, as amended. Accordingly, the parties agree to treat this Safe consistent with the foregoing intent for all United States federal and state income tax purposes (including, without limitation, on their respective tax returns or other informational statements).

*(Signature page follows)*

Document Ref: JRBK8-UKHBY-TYQXI-Y5GJD

IN WITNESS WHEREOF, the undersigned have caused this Safe to be duly executed and delivered.

**[COMPANY]**

By: *David Wishnick*

David Wishnick
CEO and President

Address:
103 Cottingham Street
Toronto, Ontario, Canada M4V 1B9

**Nutraberry Inc.**
**P.O. Box 22051**
**Seattle, WA 98122**

Email: david@nutraberryinc.com

**INVESTOR:**

**Loyal VC LP**

Email: michael@loyal.vc; kamal@loyal.vc

By: Michael Kosic

Name: Michael Kosic

Title: Director, Loyal VC GP Inc., on behalf of Loyal VC LP

By: Kamal Hassan

Name: Kamal Hassan

Title: Director, Loyal VC GP Inc., on behalf of Loyal VC LP

Document Ref: JRBK8-UKHBY-TYQXI-Y5GJD

 Gmail

# Exhibit U

David Wishnick <david.wishnick@gmail.com>

## Award funding for USDA SBIR/STTR

**Whittet, Kimberly - REE-NIFA** <kimberly.whittet@usda.gov>                    Wed, Nov 13, 2024 at 2:49 PM
To: David Wishnick <david.wishnick@gmail.com>
Cc: "Harris, Keith - REE-NIFA" <Keith.Harris@usda.gov>, "Jensen, Janette - REE-NIFA" <janette.jensen@usda.gov>,
"Coffman, Melinda - REE-NIFA" <Melinda.Coffman@usda.gov>, "Jinks, Elizabeth" <elizabeth.jinks@wsu.edu>, "Michener,
Matthew" <matthew.michener@wsu.edu>

Good afternoon, David.

I've had an opportunity to review your documentation and consult with other NIFA officials on your situation, and this is not an instance where the agency is expected to make the recipient whole. This situation appears to have happened due to the prime recipient's negligence, unfortunately.

For us to determine the next steps the agency must take; I will need to know if Nutraberry will be able to fund the project directly and complete the objectives outlined in the project proposal. When a recipient is unable to complete their project as funded, NIFA has a responsibility to recoup that money from the recipient.

We are deeply empathetic to your situation; however, NIFA has a responsibility to meet legal requirements.

I look forward to continuing to work with you to ensure we properly resolve this situation.

Thanks,

Kim

**Kimberly Whittet**
Senior Policy Advisor  |  Office of Grants and Financial Management

NIFAUSDANIFAUSDANIFAUSDANIFAUSDANIFAUSDANIFAUSDANIFAUSDANIFAUSDANIFAUSDANIFAUSDANIFAUSDANIFAUSDANIFAUSDANIFAUSDANIFAUSDANIFAUSDANIFAUSDANIFAUSDANIFAUSDANIFAUSDANIFAUSDANIFAUSDANIFAUSDANIFAUSDANIFAUSDANIFAUSDANIFAUSDANIFAUSDANIFAUSDA

<u>*</u> kimberly.whittet@usda.gov  |  ' (202) 215-3068

 **National Institute of Food and Agriculture**
U.S. DEPARTMENT OF AGRICULTURE

Feeding People | Fueling Progress | NIFA.USDA.GOV

[Quoted text hidden]

Case: 1:25-cv-06905 Document #: 15 Filed: 08/28/25 Page 85 of 94 PageID #:247

![Exhibit V]

...les » Research News » 2022 » Peanut Skins: More

# Peanut Skins: More than Meets the Eye

August 15, 2022

America's fondness for peanuts accounts for <u>65 percent</u>    of all U.S. nut consumption. Per person, that equates to nearly 8 pounds of goobers annually.

**Contact: Jan Suszkiw
Email: <u>Jan.Suszkiw@usda.gov</u>**

But what's to be done with the estimated 40 million to 70 million pounds of peanut skins that are stripped from the nut in the process of turning it into peanut butter, snack food, candy ingredients, oil and other products?

<u>Ondulla Toomer,</u> a research chemist with the Agricultural Research Service (ARS) in Raleigh, North Carolina has some ideas.

Her studies at the agency's <u>Food Science and Market Quality and Handling Research Unit</u> in Raleigh suggest a range of food and livestock feed uses that could potentially open the door to new, value-added markets for peanut skins.

Instead of landfill waste, Toomer sees untapped nutritional potential in the paper-thin skins, which are chock full of protein, carbohydrates, fats, fiber and minerals and vitamins. Peanut skins also contain bioactive compounds, including antioxidants that help neutralize cell-damaging molecules in the body called free radicals. Some, in fact, have antioxidant activity levels equal to those of green tea, grape skins and other sources.

Case: 1:25-cv-06905 Document #: 15 Filed: 08/28/25 Page 86 of 94 PageID #:248



Scientists are investigating food and livestock feed uses that may open the door to new, value-added markets for peanut skins.

On the livestock feed front, Toomer and collaborators are exploring the benefits of adding peanut skins to the diets of poultry. However, peanut skins contain tannins, which can reduce the digestion of protein from feed. The researchers have begun evaluating low inclusion levels (four percent) of peanut skins with a view to determining the optimal amount that can be added.

Aware of peanut sensitivities in some consumers, the researchers also checked for the presence of allergenic peanut proteins in egg and meat samples produced from birds fed peanut-containing diets. However, no traces of peanut allergens were detected. Another interest: determining whether birds fed peanut skins shed fewer Salmonella bacteria, which can pose a human food safety concern with the consumption of poultry meat or eggs.

On the functional food front, the researchers are comparing concentrations of bioactive compounds in different colored peanut skins, which range from red, tan and brown, to white, black and variegated.

Toomer said profiling the nutritional chemistry and properties of peanut skins is a key step towards figuring out how best to use them, with potential benefits to producers and consumers. More broadly, Toomer's efforts dovetail with the ARS lab's overarching mission to improve the productivity, processing, end-user quality and nutritional value of not only peanut, but also cucumber, sweetpotato, pepper and cabbage crops.

*The <u>Agricultural Research Service</u> is the U.S. Department of Agriculture's chief scientific in-house research agency. Daily, ARS focuses on solutions to agricultural problems affecting America. Each dollar invested in U.S. agricultural research results in $20 of economic impact.*

88

## Re: Follow-up

david nutraberryinc.com <david@nutraberryinc.com>
Mon 5/15/2023 7:06 AM

To:Ceballos, Amber <Amber.Ceballos@leg.wa.gov>

Cc:Xenia Dolovova <xenia@zerowastewashington.org>;Bryce Hesterman
<bhesterman@Recycle.com>;complianceandethics@oig.doc.gov <ComplianceandEthics@oig.doc.gov>



1 attachments (73 KB)
RCW 70A.205.715.pdf;

Hello Amber et al,

I am compelled to share a portion of my complaint since I expect you,  Rep. Sharon Tomiko Santo and of
course PreCycle and Nextcycle to acknowledge this law which is the root of this complaint:

This is the link: https://app.leg.wa.gov/rcw/default.aspx?cite=70A.205.715
RCW 70A.205.715

The intention portion of this code is very illustrative, with beneficial end user being the point.  Nutraberry
being awarded a very highly competitive federal grant, ranking in the High Priority of those who won this
grant, that proposes to transform food waste that is germane to Washington State into material that
deepens the foundational understanding of the human biology with the intent of improving human health
in comparison to producing straws, keeping in mind Nutaberry did not even make the semifinals appears
discriminatory. Please acknowledge this point.  Your resistance to this objective reality is very
disappointing. Please advise if you are able to understand and acknowledge this codified law that needs
no precedence to be evoked. If the OIC chooses to enforce this, then it will also have precedence.

**Finding—Intent—2019 c 255:** "(1) The legislature finds that the wasting of food represents a misuse of
resources, including the water, land, energy, labor, and capital that go into growing, harvesting,
processing, transporting, and retailing food for human consumption. Wasting edible food occurs all along
the food production supply chain, and reducing the waste of edible food is a goal that can be achieved
only with the collective efforts of growers, processors, distributors, retailers, consumers of food, and food
bankers and related charities. Inedible food waste can be managed in ways that reduce negative
environmental impacts and provide beneficial results to the land, air, soil, and energy infrastructure.
**Efforts to reduce the waste of food and expand the diversion of food waste to beneficial end
uses will also require the mindful support of government policies that shape the behavior and
waste reduction opportunities of each of those participants in the food supply chain.**
          (2) Every year, American consumers, businesses, and farms spend billions of dollars
growing, processing, transporting, and disposing of food that is never eaten. That represents tens of
millions of tons of food sent to landfills annually, plus millions of tons more that are discarded or left
unharvested on farms. Worldwide, the United Nations food and agriculture organization has estimated
that if one-fourth of the food lost or wasted globally could be saved, it would be enough to feed eight
hundred seventy million hungry people. Meanwhile, one in eight Americans is food insecure, including
one in six children. Recent data from the department of ecology indicate that Washington is not immune
to food waste problems, and recent estimates indicate that seventeen percent of all garbage sent to
Washington disposal facilities is food waste, including eight percent that is food that was determined to
be edible at the time of disposal. In recognition of the widespread benefits that would accrue from
reductions in food waste, in 2015, the administrator of the United States environmental protection

agency and the secretary of the United States department of agriculture announced a national goal of reducing food waste by fifty percent by 2030. The Pacific Coast collaborative recently agreed to a similar commitment of halving food waste by 2030, including efforts to prevent, rescue, and recover wasted food.

       (3) By establishing state wasted food reduction goals and developing a state wasted food reduction strategy, it is the intent of the legislature to continue its national leadership in solid waste reduction efforts by:

       (a) Improving efficiencies in the food production and distribution system in order to reduce the cradle to grave greenhouse gas emissions associated with wasted food;

       (b) Fighting hunger by more efficiently diverting surplus food to feed hungry individuals and families in need; and

(c) Supporting expansion of management facilities for inedible food waste to improve access and facility performance while reducing the volumes of food that flow through those facilities."

---

**From:** david nutraberryinc.com <david@nutraberryinc.com>
**Sent:** Saturday, May 13, 2023 10:14 AM
**To:** Ceballos, Amber <Amber.Ceballos@leg.wa.gov>
**Cc:** Xenia Dolovova <xenia@zerowastewashington.org>; Bryce Hesterman <bhesterman@Recycle.com>; complianceandethics@oig.doc.gov <ComplianceandEthics@oig.doc.gov>
**Subject:** Re: Follow-up

FYI - I pointed to the following RCW 70A.205.715 Food waste reduction—Goal—Plan—Definitions.

https://app.leg.wa.gov/rcw/default.aspx?cite=70A.205.715

This codified law has a priority listed, and you know it is a priority since it also says in descending order. In point (i) is preventing edible food waste and then below are other lesser priorities.

       (a) The wasted food reduction and food waste diversion plan must include strategies, **in descending order of priority, to:**
       (i) Prevent and reduce the wasting of edible food by residents and businesses;
       (ii) Help match and support the capacity for edible food that would otherwise be wasted with food banks and other distributors that will ensure the food reaches those who need it; and

---

**From:** david nutraberryinc.com <david@nutraberryinc.com>
**Sent:** Friday, May 12, 2023 7:58 PM
**To:** Ceballos, Amber <Amber.Ceballos@leg.wa.gov>
**Cc:** Xenia Dolovova <xenia@zerowastewashington.org>; Bryce Hesterman <bhesterman@Recycle.com>; complianceandethics@oig.doc.gov <ComplianceandEthics@oig.doc.gov>
**Subject:** Re: Follow-up

Hello Amber,

I plan to follow up with you the OIC and submit a complaint as the note from the Ethics OIC person suggested.

That is good to know these groups are happy to speak.

I am happy to speak to either of them as well. They can set up a time to speak with me if they have changed their mind about this situation.

9/6/23, 8:07 AM
Mail - david nutaberryinc.com - Outlook
Case: 1:25-cv-06905 Document #: 15 Filed 08/28/25 Page 90 of 94 PageID #:252

There are numerous codes and bills in places that reflect my perspective that preventing food waste, to keep edible food edible is of a higher priority than creating low value industrial uses, like straws. For example, HOUSE BILL 1799 goes into great detail.

I will include these in my complaint and cite where needed.

If the OIC enforces these laws, then there becomes a precedent. Or saying it another way, these are congressional passed and already codified laws that express a purpose that has been undermined by the very groups that were involved in their passage.

Our business is perfectly eligible for all these competitions, but agree it far exceeds the merit of the other teams and the disparity is obvious. Many others have contacted me saying the same.

These are competitions that Nutraberry has been persistently and consistently met with the same bias, where the pattern in my opinion meets the threshold of discriminatory and is the purpose of my complaint to the OIC.

Our proposal to each competition has been commercializing sizing our seed powders to a mean of 5 micron or the size of a single plant cell. The finest a stone mill can mill this material is 210 microns. We are in the development phase of taking our 210 micron and scaling material that is 43x finer (210/5 = 43) to studying the increased activity in microbiome.

This amplification of activity in the microbiome is what earned our awarded of a USDA Phase I grant to further study and validate. This also eliminates any settling in beverages or grit is baking, or texture issues in other foods.

Being awarded this grant meets a higher level of competitive and merit, where I would ask the OIC to request the cc'ed groups to explain how they ignored the value of Nutaberry's technology utilization that improves human health while preventing edible food from going into the landfill.

In my forthcoming complaint, I plan to explain this science to illustrate fully the disparity of utility of our product to other business that proceed to the semi and finals of numerous WA State circular competition as egregiously being biased.

Finally, we seem to both acknowledge this is wrong since we are eligible for a completion and have built a business that has greater merit than those who were awarded 10's of thousands of dollars. I am not sure where this sense of entitlement and bias comes from. It is very disappointing.

Thank you and my next step is to submit the complaint to another department within the OIC as we already have one that has been reviewed and accepted.

Thank you for your time and attention.

David
425-577-9020

---

**From:** Ceballos, Amber <Amber.Ceballos@leg.wa.gov>
**Sent:** Tuesday, May 9, 2023 7:57 PM
**To:** david nutraberryinc.com <david@nutraberryinc.com>
**Cc:** Xenia Dolovova <xenia@zerowastewashington.org>; Bryce Hesterman <bhesterman@Recycle.com>;

Case: 1:25-cv-06905 Document #: 15 Filed: 08/28/25 Page 91 of 94 PageID #:253

complianceandethics@oig.doc.gov <complianceandethics@oig.doc.gov>

**Subject:** Follow-up

Good Afternoon David,

I apologize again for taking so long to get back to you. I was able to connect with Xenia and Bryce at PreCycle and NextCycle. I asked if they were willing and able to provide more insight into how their decisions were made by providing grading criteria and a breakdown of their evaluation of your team during your participation in their selection processes. Both entities were more than happy to schedule a meeting with you to provide direct feedback and answer any questions you may have about their determination process. I think this would be a great way to get more insight to some of things you stated to us when you first wrote, such as "we have never been told what criteria we did not fit into."

As for your previous statements that "Nutraberry, upcycled edible food and is in clearly in bucket (i) and upcycled straws are (iii) in priority per RCW 70A.205.715. There is a lawful priority in activities when addressing rebuilding a material economy to being circular," I feel like this must be addressed before proceeding. The order in which items are listed in RCW 70A.205.715 does not establish an order of precedence or priority. They are only ordered and listed in a manner that makes reading the RCW easy to comprehend. A "i" listing does not precede an "iii" listing in level of priority. It is only a matter of wording which gave each category these listed lines.

Based on the emails and correspondence you have provided me, I cannot find any instances of observable hate or discrimination against Nutraberry. It appears there might be reasoning behind why your team was not selected, one of which being that you do have so much merit and that your company has been able to prove itself in this very difficult process. From the NextCycle and PreCycle websites, I have ascertained that these entities are searching for the "best product, service, or idea" that addresses the criteria in which they have posted. Specifically, in PreCycle's "about" statement, it says that their awards are looking for the best "idea-stage and development-stage startups." It is very possible that due to the high merit and level of establishment that you have been able to form with Nutraberry that you may not fit the criteria because you are more well-established than the rest of the competition pool.

As for your statement that says "When we asked about the results, we were told the judges signed NDA's and we cannot discuss this. We were told better luck next year and when next year rolled around got the same results." I think this statement would be very important to highlight for the Inspector General's office. I am happy you have reached out and established a case number with them. My next action to suggest to you, if the discussions with the PreCycle and NextCycle representatives did not yield the results you were looking for, was going to be to file a complaint with the Office of the IG. It should be noted that a Legislator's office, such as Rep. Santos', can only assist constituents in bringing a case to the attention of the proper officials and guide the constituent through the process, but cannot direct an agency to decide a matter in their favor. The appropriate overseeing agency(ies) must make its decisions within the framework of the law and existing rules and regulations.

This means that our office can:
• request information or status reports.
• arrange for appointments or facilitate direct communication between the agency and the constituent.
•express an opinion on a matter or agency decision (subject to ex parte communication rules and the prohibition on abuse of position-- ex parte means a legal proceeding brought by one person in the absence of and without representation or notification of other parties).
• ask for reconsideration, based on law and regulation, of an administrative decision.

Outside of these parameters, our office cannot intervene. As I stated at the beginning of this message, both Bryce and Xenia state that are willing to meet with you and provide transparency as to how the competitive processes came to their conclusion. I feel it may be very beneficial for you to have a mediator present during these discussions. The Dispute Resolution Center of King County is a great resource for this. If you would like suggestions for other resources, please do not hesitate to reach out and ask.

Case: 1:25-cv-06905 Document #: 15 Filed: 08/29/25 Page 92 of 94 PageID #:254

I realize this response is likely not the one you were hoping for from our office. However, I have every confidence that the Office of the Inspector General will find any wrongdoings, if there are any to be found. In the meantime, if you feel there is more to discuss with our office, please let me know.

Thank you for your time and bringing this matter to our attention. We hope we are able to help you resolve this issue.

Very respectfully,

## Amber M. Ceballos

Legislative Assistant | House of Representatives

Office of Rep. Sharon Tomiko Santos | 37th Legislative District

321 John L. O'Brien Bldg. Olympia, WA 98504

Ring Central: 360-360-0258

[housedemocrats.wa.gov](housedemocrats.wa.gov)| [amber.ceballos@leg.wa.gov](amber.ceballos@leg.wa.gov)



**E**qua**l**i**t**y. **Fairness. Opportunity.**

NOTICE OF PUBLIC DISCLOSURE: Please note, this email and any documents you send this office may be subject to disclosure requirements under the state Public Records Act, RCW 42.56



# Exhibit X

204 Hawley Street
Lynden, WA 98264
tel 360-354-8767
fax 360-354-0948
www.red-raspberry.org
info@red-raspberry.org

November 6, 2023

Mr. David Wishnick
Co-Founder
Nutraberry,LLC
PO Box 82633
Kenmore, WA 98028

Re: Nutraberry Washington State Department of Agriculture (WSDA) Local Food System Infrastructure gran application support

Dear David:

This letter is in support of Nutraberry, LLC's application to the WSDA Local Food System Infrastructure grants which to support the development and commercialization of high-quality berry seed powders and oils from the seed slurry, or 'seedcake', generated from Washington State raspberry processors.

The Washington State Red Raspberry Commission (WRRC) was established in 1976 with the aim to support and promote the raspberry industry in Washington State. Washington leads in processed raspberry production with 99% of the state's annual production located in Whatcom County. One role of our board is to support projects to expand markets for our berries, helping our growers remain economically sustainable.

The WRRC is supportive of Nutriberry's business model and the development of a market for Washington State raspberry seedcake from the NW Berry Co-Op in Lynden, WA and directly from other berry processors in WA State. Together this product has the potential to impact over 50 small raspberry farmers by creating an additional revenue stream, clearly illustrating the broad impact this product could make in our economy.

Therefore, I endorse Nutaberry's vision and product roadmap and encourage you to give serious consideration to investing grant money in their innovative and promising new approach to their single digit micronized upcycled berry seed powder food ingredients.

Please do not hesitate to contact me with any questions.

Sincerely,

Henry Bierlink
Executive Director



SVZ-USA Washington, Inc
1700 North Broadway
PO Box 715
Othello, WA 99344
Phone (+1) 509-488-6563
Fax    (+1) 509-488-2631

**Date: 29OCT2023**

Subject: Letter of Support for Nutraberry Inc.

To whom it may concern:

SVZ-USA Washington, Inc., processes a wide variety of fruits and vegetables into high quality purees and juices for discerning customers. Most of our raw materials are either locally sourced or contract grown by local farmers. We have interest in Nutraberry's grant application, and their potential for further valorization of the side stream from our current processes. The reduction of food waste, upscaling and valorization of side stream pomaces is of great interest to our company. Progress in areas such as this will lend to greater competitiveness and shared success in our state and agricultural region. We look forward to the development of technology, capacity, and market development for these additional opportunities, such as those pursued and developed by Nutraberry.

If additional information would be helpful, please feel free to contact me directly.

Yours sincerely,

*David Stewart*

David Stewart, President
david.stewart@svz.com   (509) 989-9939
SVZ-USA Washington, Inc.
1700 N Broadway Ave
Othello, WA 99344